UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
CIVIL DIVISION

| | | |
|---|---|---|
| WAI HOE LIEW A/K/A MICHAEL W. LIEW, }<br>KHURRAM KAYANI, AND ELIZABETH K ATWOOD }<br>A/K/A ELIZABETH KING }<br>                                    Plaintiffs, }<br>        v }<br>}<br>COHEN & SLAMOWITZ, LLP, }<br>MITCHELL SELIP, MITCHELL G. SLAMOWITZ, }<br>AND DAVID A. COHEN, }<br>                                    Defendants. } | | Civil Action, File No.<br><br>2:14-cv-04868-KAM-MDG |

**AFFIRMATION OF MITCHELL L. PASHKIN, ESQ. IN OPPOSITION TO DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' ATTORNEY**

Mitchell L. Pashkin, an attorney at law duly admitted to practice in the courts of the State of New York and in the Eastern District of New York, hereby declares under penalties of perjury pursuant to 28 USC §1746 as follows:

1. I do not have any confidential or privileged information related to Coble or related to any Defendant. There is no information which I possess which is not available from the court documents on PACER. All of the information set forth in the Complaint is taken from my review of the docket in Coble and various documents filed in the Coble case along with my independent representation of the three plaintiffs. I first learned about the Coble case from an article in the New York Law Journal about the court's denial of Defendants' motion to dismiss the Coble case. After Defendants terminated me and I re-started my own practice and began focusing on defending consumers in collection cases, my co-counsel Jesse Langel started to refer me overflow work and work for various reasons he could not or did not want to handle. It was a coincidence that he referred me

the cases of the three plaintiffs. Upon seeing the affidavit of service in Mr. Liew's case and the Consent to Change Attorney executed by Defendants and given to a new debt collection law firm, I started to review the docket in <u>Coble</u> and various documents filed in the <u>Coble</u> case. I later began to represent the other Plaintiff's in defense of collection actions and realized the potential scope of the problem. I also did a tremendous amount of research to ascertain whether or not there were FDCPA violations.

2. Thomas A. Legorn, Esq.'s ("Leghorn") statement in paragraph 8 of his affirmation is false. I never was on a call as part of any mediation. On more than one occasion in response to my question to David A. Cohen about participating in these calls, he specifically told me that he did not need me to be a part of the calls.

3. My only "involvement" in the mediation was acting as a "secretary" for David A. Cohen to let him know when the mediation sessions were going to take place and to let the mediator know if and when David A. Cohen was available. I am not sure when this started; but it definitely had to be after Defendants' fired my predecessor as Managing Attorney, Leandre John, Esq., in the late Spring of 2013 and made me Managing Attorney. Prior to their termination of Leandre John, Esq., I had absolutely no involvement in any FDCPA litigation at Cohen & Slamowitz. Leandre John handled all FDCPA matters for Cohen & Slamowitz not handled by outside counsel; and he handled everything needed to assist outside counsel. He was the sole representative of the firm on all FDCPA matters.

4. I played absolutely no other "part" in the mediation. I could not provide any details as to the purpose or content of the mediation sessions.

5. At the time I reviewed the settlement agreement, I was the Managing Attorney. I believe it was toward the end of my time at Defendants. As the Managing Attorney and prior to that as the Assistant Managing Attorney I was in charge of all litigation concerning debt collection cases in state courts. This included responding or overseeing the responses to motions to vacate judgments and dismiss cases. This was the only context in which I reviewed the settlement agreement. David A. Cohen asked me to review the settlement agreement to see how it would affect or determine how we responded to motions to vacate judgments and dismiss cases involving lawsuits served by Midlantic process server which we received going forward. As I remember, there only were one or two small paragraphs which had any bearing on this issue. I did give David A. Cohen and Thomas Leghorn my opinion on these paragraphs including giving my opinion during a conference call with David A. Cohen and Thomas Leghorn about this issue and the broader issue of how we would respond to motions to vacate judgments and dismiss cases involving lawsuits served by Midlantic process server which we received going forward.

6. I was not involved in communicating with Coble's counsel in getting changes to these paragraphs. As shown by the docket in the Coble case, the settlement agreement was finalized and submitted to the court well after Defendants had terminated my employment.

7. On page 3 of Defendants' Memorandum, Defendants write as follows: "He participated in conversations where he was asked to review the agreement to see how it would affect further Midlantic suits; (3) He provided his opinions to Cohen and Leghorn on the settlement drafts and future Midlantic suits going forward." Defendants' use of the phrases "further Midlantic suits" and "future Midlantic suits going forward"

misrepresents what I wrote in my November 11, 2014 letter to this court and attempts to make it appear like my involvement in reviewing the draft settlement agreement related to the future possible defense of Defendants in lawsuits against them related to Midlantic. This characterization is false. In my November 11, 2014 letter and above, I refer to "motions to vacate judgments and dismiss cases involving lawsuits served by Midlantic process server which we received going forward". An example of this type of motion would be as follows: At some point, Defendants, on behalf of a client of theirs such as Citibank, Capital One Bank, Discover Bank, etc., would have obtained a default judgment against a consumer where the process serving company was Midlantic. The consumer would file a motion with the New York state court to vacate the default judgment claiming they never had been served with the lawsuit. I would be responsible for ensuring that our response to the motion to vacate the default judgment would be not be an issue based on the one or two small paragraphs in the settlement agreement.

8. This also was not confidential. Motions to vacate default judgments got assigned to each of the 7 litigation associate attorneys I managed. If they received a motion to vacate default judgment where the process serving company was Midlantic, they would have to come to me to discuss the motion and whether or not we would oppose it or just consent. As part of this discussion and decision, I would discuss with them that the reason for this type of analysis related to the Coble lawsuit and settlement.

9. This type of open discussion about motions to vacate a default judgment where the process serving company was Midlantic did not always occur. Although I did not realize it until I got involved in this manner towards the end of my employment at Defendants, Leandre John was dealing with these motions in a different and fairly secretive manner

while he was Managing Attorney. At some point, I remember Leandre John issuing a directive that he was to be told about all motions to vacate a default judgment where the date of the index number issued by the New York state court was before a certain year. He would review these motions and decide whether to oppose them or consent. He never explained why he was doing this or the basis for his decision. I later realized that he was looking only at index numbers issued before a certain year because Defendants stopped using Midlantic at a certain point in time.

10. My involvement in "compiling" class lists was limited to acting as a messenger and go between among David A. Cohen, Edward Wilkinson, Manager of Defendants' IT Department, and Thomas Leghorn. David A. Cohen asked Edward Wilkinson to run a search based on the scope of the class as set forth in the draft of the settlement agreement and asked me to make sure that Edward Wilkinson timely got me the information (In many instances having nothing to do with any FDCPA case, David A. Cohen or others would task me with obtaining information from the IT Dept. and conveying it to them.). I then conveyed it to Thomas Leghorn and made sure that it was the information he needed. This information also consisted of only 2 different numbers representing the two different classes. There was no list of consumer names, index numbers, file numbers, etc. I also was present at one meeting between Defendant Mitchell Selip and Edward Wilkinson to determine how Edward Wilkinson would structure the search terms. I did not review any of the files identified by the search, was not involved in determining the scope of the class as set forth in the settlement agreement, and was not involved in any communications with Coble's counsel regarding the class lists. I know nothing more about the class than is set forth in the filed Settlement Agreement.

11. Again, the settlement agreement was finalized and submitted to the court well after Defendants had terminated my employment. I have no idea when the number was finalized or what if any changes were made to the number after I left.

12. Legorn's statement in paragraph 6 of his affirmation is false. I never as claimed by Leghorn "participated in multiple conversations regarding the strategic reasoning for engaging in settlement, the scope of settlement, and strategic issues related to the formation of a sub-class".

13. The first time I had any involvement in the <u>Coble</u> case was when David A. Cohen asked me to review the settlement agreement as set forth above in this affirmation. Before this, I did not know that Defendants had settled <u>Cobble</u> or even were working on settling <u>Coble</u>. As far as I know, at the time I first had any involvement in <u>Coble</u>, Defendants already had decided to settle the case. This had to have been the reason for the existence of the draft settlement agreement.

14. Legorn's statement in paragraph 4 of his affirmation is false. I never as claimed by Leghorn "participated in conversations which included the class plaintiff counsel's demands for more detailed information regarding and supporting the question of the net worth of C&S". Again, my only involvement with <u>Coble</u> was as I have stated above in this affirmation.

15. Defendants allowing me or even asking me to participate in conversations regarding their net worth would be contrary to many other facts:

    a. Defendants never discussed their finances with me;

    b. I frequently was being reprimanded by David Cohen, Mitchell Slamowitz and Mitchell Selip for exceeding my authority.

c. In a meeting with David Cohen and Mitchell Slamowitz in Mitchell Slamowitz's office, David Cohen told me that I had no right to get involved in discussions with their client, Midland Funding, LLC and pointed out that "you are only the Assistant Managing Attorney"

d. In Mitchell Slamowitz's office, Mitchell Slamowitz told me that I was "spreading my wings too far" after Mitchell Selip complained to him about something I said to a client during their visit to the office.

17. I also never actually was introduced to Leghorn in person. My only conversations where Leghorn was a participant were over the telephone. I do remember him coming to Defendants' office somewhat early during my employment at Defendants. My office at Defendants was between the front door and the executive conference room and the offices of Leandre John, David Cohen, Mitchell Slamowitz and Mitchell Selip. I remember Leghorn coming to the office and remember seeing Leandre John, David Cohen, Mitchell Slamowitz and Mitchell Selip passing by my office with Leghorn on numerous occasions. At one point, David Cohen came into my office as they all were passing by and offered me a half of a sandwich that they ordered in from Ben's.

18. Defendants claim that they were a client of mine regarding <u>Coble</u>. This is a completely false statement both factually and legally for the following reasons:

   (a) A review of the docket in the <u>Coble</u> case shows that I am not listed as the attorney for any of the defendants in <u>Coble</u>;
   (b) I began my employment with Defendants on 6/13/11. This <u>Coble</u> case was filed on 2/15/11.
   (c) Leandre John filed a Notice of Appearance on 5/20/11;
   (d) Thomas Leghorn then filed a Notice of Appearance on 6/7/11; and Joseph Francoeur later filed a Notice of Appearance on 7/19/13;
   (e) Leandre John, the former Managing Attorney of Defendants, is listed on the docket as representing the defendants in <u>Coble</u>. <u>Coble</u> continued long after

Leandre John no longer was with Defendants; and I was not substituted in for Leandre John;

(f) Every document filed with the court on behalf of Defendants was filed by Thomas Leghorn or Joseph Francoeur. I am not listed on the docket as an attorney for Defendants and never filed anything with the court on their behalf;

(g) I never authored any part of a legal document or represented Defendants at any court appearance, deposition, motion, conference or any other event in the <u>Coble</u> case;

(h) I never was offered or received any extra compensation in relation to the <u>Coble</u> case;

(i) There was never proposed or executed any retainer agreement between Defendants and myself in relation to the <u>Coble</u> case;

(j) I believe that Thomas Leghorn and his firm were retained by the insurance carrier providing coverage to Defendants in the <u>Coble</u> case and I never have been approved by any insurance carrier to defend an FDCPA defendant; and

(k) Defendants considered only Thomas Leghorn to be their attorney in the <u>Coble</u> case and never even would have considered allowing me to represent them in the <u>Coble</u> case. This is evidenced by the following facts:

   i. While I was employed at Defendants, David A. Cohen repeatedly told me that I did not have enough experience to represent them in FDCPA cases;
   ii. Eventually somewhere in the middle of 2013, Defendants allowed me to defend them on 2 or 3 small and fairly frivolous FDCPA cases that had no implications beyond the case itself. Most of them were so baseless or frivolous that I was able to secure a voluntary agreement to dismiss after one court appearance or prior to interposing an answer;
   iii. During and after the time they let me defend these small FDCPA cases, several other FDCPA lawsuits were brought against them. These lawsuits all involved the legality of their general overall practices such as the lack of a 1099-c notice in a settlement letter, the use of allegedly fraudulent statements from Discover Bank and a class action alleging the filing of lawsuits in improper venues. Each time these lawsuits came around I pleaded with David A. Cohen to allow me to handle the defense of these lawsuits; but each time he refused telling me that I did not have enough experience and told me that they were going to have one of the normal FDCPA defense attorneys handle the case;
   iv. At the time Defendants terminated me as an employee, David A. Cohen and Mitchell G. Slamowitz told me that while they no longer could have me as an employee that they would be able to give me more than enough per diem work handling regular collection cases to keep me busy (They gave me one case on behalf of Discover Bank a week after they fired me and then never assigned me any other cases.). At the same time, I asked about handling their FDCPA defense work as outside counsel. David A. Cohen said he would have to think about that; but during a telephone call a few weeks later with the two of them, he said that he did not think I knew enough for them to allow me to handle the FDCPA work;

v. I currently am representing a plaintiff in a proposed class action against Defendants in the case of Mark Sam v Cohen & Slamowitz, LLP, et. al, 1:14-cv-00611-JTC. Defendants have opposed Mark Sam's class certification motion in part based on my lack of qualifications to represent a class. In their opposition to the class certification, Joseph Francoeur wrote as follows: "Defendants herein are well-aware that counsel, Mitchell Pashkin, is inexperienced as class counsel as Mr. Pashkin worked as an employee for the defendants for three years until January, 2014, at which time C&S terminated his employment."; and

vi. The above shows that Defendants never would have let me represent them in a class action action case such as Coble which involved allegations of fraudulent service of process for a period of several years involving as it turns out of 50,000 consumers. It is not reasonable for Defendants to have believed that I represented them or to even allege that I did.

19. The nature and scope of my responsibilities as an employee at Defendants already is set forth on the CV which Defendants have included as Exhibit C to their motion. Most of my responsibilities had nothing to do with FDCPA defense litigation. My main responsibilities were the management of all the affirmative litigation against consumers on behalf of Defendants' clients, the management and teaching of the associate attorneys and the direct handling of a case load of thousands of files mostly dealing with defending counterclaims against the clients.

20. The only bullet points on my CV which relate to the FDCPA are as follows:

> "Acted as liaison between firm and insurance company defense attorneys regarding strength of case, substantive defense options, litigation strategy, and case status. Reviewed, revised as needed, and approved all submissions to court or communications to opposing counsel by insurance company defense attorneys in defense of federal class actions and non-self defended federal district court actions regarding alleged violations of the FDCPA. Gathered information and documents for Rule 26 disclosures and worked with IT department to compile and gather electronic information for discovery responses and to ascertain scope of potential liability. Liaison between employer and clients regarding risks to them resulting from lawsuits against firm and steps being taken by firm to correct problems which resulted in lawsuits. Made recommendations to Senior Management of law firm based on issues exposed by lawsuits against firm, potential risks related to practices of its clients, and operational deficiencies."

21. All of these responsibilities however did not start until well after Defendants terminated Leandre John and I became Managing Attorney in the late Spring of 2013. Also, other than the work I described above related to Coble, all of my work described in the above quoted portions of my CV had nothing to do with Coble, Leghorn or his firm. The insurance company defense attorneys with whom I was a liaison was not Leghorn or his firm. The insurance company defense attorneys with whom I was a liaison were Wendy Shepps, Esq. of Podvey Meanor, 1037 Raymond Blvd., Ste. 800, Newark, NJ 07102 and Andrew Sayles, Esq. of Connell Foley, 85 Livingston Avenue, Roseland, NJ 07068. None of my work with these attorneys had anything to do with Coble, any of the issues in Coble, or any of the issues in the case at bar. There were no issues related to service of process, default judgment or transferring of files.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: December 22, 2014

_____
Mitchell L. Pashkin, Esq.