UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL HALLMARK,

Plaintiff,

vs.

COHEN & SLAMOWITZ, LLP, and
MIDLAND FUNDING LLC d/b/a
MIDLAND FUNDING OF DELAWARE LLC

Defendants.

**DEFENDANT COHEN &
SLAMOWITZ'S SECOND
SUPPLEMENTAL RESPONSE TO
PLAINTIFF'S DISCOVERY
DEMANDS, INTERROGATORIES
AND REQUEST FOR PRODUCTION
OF DOCUMENTS**

Case No.: 11-CV-0842S(F)

COHEN & SLAMOWITZ, LLP, by and through its attorneys, Smith, Sovik,
Kendrick & Sugnet, P.C., hereby provides these Second Supplemental Responses to
plaintiff's First Set of Discovery Demands and Request for Production of Documents as
follows:

## GENERAL OBJECTIONS

By responding to these demands, defendant does not concede the materiality of
the subject to which it refers. Defendant's responses are made expressly subject to, and
without waiving or intending to waive, any questions or objections as to the competency,
relevance, materiality, privilege or admissibility as evidence or for any other purpose, of
any of the documents or information produced, or of the subject matter thereof, in any
proceeding including the trial or any subsequent proceeding.

Defendant objects to the extent that plaintiff demands documents and/or
information which are protected by the attorney-client or work-product privilege, or
which constitute material prepared for litigation purposes.

Inadvertent production of any document or information which is privileged, was prepared in anticipation of litigation, or is otherwise immune from discovery, shall not constitute a waiver of any privilege or of another ground for objecting to discovery with respect to such document or information or the information contained in any document or of defendant's right to object to the use of any such document or the information contained therein during any proceeding in this litigation or otherwise. Defendant also objects in the entirety to any request for documents that is not limited in time.

Defendant objects in the entirety to any request for information which is not in its possession, custody or control.

Defendant is continuing to search for information responsive to plaintiff's demands and therefore reserves the right to supplement this response to each demand with additional information if and when such information becomes available to defendant's counsel. Defendant reserves the right to object to the future disclosure of any such information.

Defendant reserves the right to make any further applicable objection, whether or not said objection is delineated above. The above objections in no way affects defendant's right to make applicable objections as the course of this matter progresses.

1.     Plaintiff is a person and citizen of New York who resides in Erie County, New York.

ANSWER:   Defendant denies knowledge or information sufficient to provide a response.

2.     Plaintiff is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3).

2

ANSWER:     Admits.

3.      Defendant Midland is engaged in the collection of debts from persons using the mail and/or telephone.

ANSWER:     Defendant denies knowledge or information sufficient to provide a response.

4.      Defendant Midland regularly attempts to collect consumer debts alleged to be due to another.

ANSWER:     Defendant denies knowledge or information sufficient to provide a response.

5.      Defendant Midland was and is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

ANSWER:     Defendant denies knowledge or information sufficient to provide a response.

6.      Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 40 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER:     Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form.  Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above.  In each instance, the letter was sent out before a Summons and Complaint was filed.

7.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 100 or more consumers with New York State addresses during the period from March 9,2011 through March 9, 2012.

ANSWER:    Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

8.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 300 or more consumers with New York State addresses during the period from March 9,2011 through March 9, 2012.

ANSWER:    Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

9.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 500 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER:    Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were

4

mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

     10.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 700 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

     ANSWER:    Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

     11.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 1,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

     ANSWER:    Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

     12.    Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 1,500 or more consumers with New York State addresses during the period from March 9, 2011 through March 9,2012.

5

ANSWER: Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

13. Defendant C&S sent letters in a form substantially similar or materially identical to Exhibit A to these discovery demands to 2,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant objects to this request as it is vague, ambiguous and overbroad and is an improper request in its present form. Notwithstanding this and other objections, defendant admits that approximately 38,325 letters in a similar format were mailed during the timeframe noted above. In each instance, the letter was sent out before a Summons and Complaint was filed.

14. Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 40 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as

they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only <u>after</u> the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

15. Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 100 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only <u>after</u> the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

16. Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received

by the Court Clerk, to 300 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

    ANSWER:    Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

    17.    Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 500 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

    ANSWER:    Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and

Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

18.     Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 700 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER:     Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee.   Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

19.     Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 1,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

9

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

20. Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 1,500 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen

& Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

21.     Defendant C&S sent letters demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 2,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER:     Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors and filing of Summons and Complaints. Based upon this information, defendant states that such letters are sent with the fee included only after the check for the filing fee had been cut by defendant, Cohen & Slamowitz. Defendant sent out 38,325 such letters before a Summons and Complaint had been filed.

22.     Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 40 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk cashed a check for a filing fee. Notwithstanding this and other objections, defendant states that it can only report information contained within its own records as they relate to certain correspondence sent to debtors. Based upon this information, defendant states that such letters are sent with the fee included only <u>after</u> the check for the filing fee had been cut by defendant, Cohen & Slamowitz. There is no way for Cohen & Slamowitz to determine when the Clerk cashed the check. In that situation, approximately 17,475 letters were sent out, before the Summons and Complaints were filed.

23. Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 100 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the

12

time frame noted above. As noted in the above responses, such letters are sent only <u>after</u> the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

24. Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 300 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only <u>after</u> the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

25. Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 500 or more consumers

13

with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only after the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

26. Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 700 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular

check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only <u>after</u> the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

27.     Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 1,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER:     Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee.     Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk.     However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only <u>after</u> the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

28.     Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check

for the City Court filing fee was received by the Court Clerk, to 1,500 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections, defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only after the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

29.     Defendant C&S sent letters, regarding debts allegedly owed to Midland, demanding fees for filing a summons and complaint with a City Court, before the check for the City Court filing fee was received by the Court Clerk, to 2,000 or more consumers with New York State addresses during the period from March 9, 2011 through March 9, 2012.

ANSWER: Defendant denies information sufficient to respond to this request. Defendant cannot state with particularity when any specific letter was specifically placed in the custody of the U.S. Postal Service, nor can defendant state when any given court clerk received a check for a filing fee. Notwithstanding this and other objections,

defendant states that it has limited information concerning when it was that any particular check was cashed by a New York State Court Clerk. However, upon information and belief, approximately 17,475 such letters were sent out on Midland accounts during the time frame noted above. As noted in the above responses, such letters are sent only after the check for the filing fee has been cut by defendant, Cohen & Slamowitz. The letters were sent before the Summons and Complaints were filed.

30. Defendant C&S's net worth is greater than $1,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant states, upon information and belief, that C&S's net worth is less than $1,000.00 as the firm has no retained earnings or real property.

31. Defendant C&S's net worth is greater than $5,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

32. Defendant C&S's net worth is greater than $10,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of

relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

33. Defendant C&S's net worth is greater than $25,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

34. Defendant C&S's net worth is greater than $50,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

35. Defendant C&S's net worth is greater than $75,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

36. Defendant C&S's net worth is greater than $100,000.00.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

18

37.     Defendant C&S's net worth is greater than $200,000.00.

ANSWER:   Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information.   Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies.  See response to "30" above.

38.     Defendant C&S's net worth is greater than $300,000.00.

ANSWER:   Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information.   Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies.  See response to "30" above.

39.     Defendant C&S's net worth is greater than $400,000.00.

ANSWER:   Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information.   Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies.  See response to "30" above.

40.     Defendant C&S's net worth is greater than $500,000.00

ANSWER:   Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information.   Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies.  See response to "30" above.

41.     Defendant C&S's net worth is greater than $1 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

42. Defendant C&S's net worth is greater than $5 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

43. Defendant C&S's net worth is greater than $10 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

44. Defendant C&S's net worth is greater than $15 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

45. Defendant C&S's net worth is greater than $20 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of

relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

46. Defendant C&S's net worth is greater than $25 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

47. Defendant C&S's net worth is greater than $30 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

48. Defendant C&S's net worth is greater than $35 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

49. Defendant C&S's net worth is greater than $40 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

50. Defendant C&S's net worth is greater than $45 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

51. Defendant C&S's net worth is greater than $50 million.

ANSWER: Defendant objects as this is an improper request and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of relevant information. Defendant further objects as no class has yet been certified. Notwithstanding these objections, defendant denies. See response to "30" above.

52. Defendant Midland's net worth is greater than $1,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

53. Defendant Midland's net worth is greater than $5,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

54. Defendant Midland's net worth is greater than $10,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

55. Defendant Midland's net worth is greater than $25,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

22

56. Defendant Midland's net worth is greater than $50,000.00-

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

57. Defendant Midland's net worth is greater than $75,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

58. Defendant Midland's net worth is greater than $100,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

59. Defendant Midland's net worth is greater than $200,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

60. Defendant Midland's net worth is greater than $300,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

61. Defendant Midland's net worth is greater than $400,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

62. Defendant Midland's net worth is greater than $500,000.00.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

63. Defendant Midland's net worth is greater than $1 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

64.    Defendant Midland's net worth is greater than $5 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

65.    Defendant Midland's net worth is greater than $10 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

66.    Defendant Midland's net worth is greater than $15 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

67.    Defendant Midland's net worth is greater than $20 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

68.    Defendant Midland's net worth is greater than $25 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

69.    Defendant Midland's net worth is greater than $30 million.

ANSWER:    Defendant denies knowledge or information sufficient to provide a response.

70.    Defendant Midland's net worth is greater than $35 million.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

71. Defendant Midland's net worth is greater than $40 million.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

72. Defendant Midland's net worth is greater than $45 million.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

73. Defendant Midland's net worth is greater than$50 million.

ANSWER: Defendant denies knowledge or information sufficient to provide a response.

74. Defendant C&S sent the letter attached to these discovery demands as Exhibit A to Plaintiff on or about August 17, 2011.

ANSWER: Defendant objects as the request is vague and ambiguous. Notwithstanding this and other objections, defendant admits.

75. In the letter attached as Exhibit A to these discovery demands, Defendant C&S demanded a fee for filing a summons and complaint with the City Court of Buffalo in the amount of $140.00, as part of the total amount demanded of $1,982.89.

ANSWER: Defendant admits.

76. On August 25, 2012, Defendant filed a summons and complaint in the City Court of Buffalo in the case entitled Midland Funding LLC DBA in New York as Midland Funding of Delaware LLC bearing Index No. 8173-2011.

ANSWER: Defendant objects as the request is vague and ambiguous. Notwithstanding this and other objections, defendant denies that it filed the Summons and Complaint on August 25, 2012. The Summons & Complaint was stamped filed on August 25, 2011. Defendant admits that it presented the Clerk with the Summons and Complaint for filing on or about August 25, 2011.

77. A true, accurate, genuine, and complete copy of the summons and complaint filed with the City Court of Buffalo in the case entitled Midland Funding LLC DBA in New York as Midland Funding of Delaware LLC, Index No. 8173-201, is attached to these discovery demands as Exhibit B.

ANSWER: Defendant objects as the request is vague and ambiguous. Notwithstanding this and other objections, defendant admits.

78. On August 24, 2011, Defendant paid a filing fee to the City Court of Buffalo in the amount of $140.00, in the case entitled Midland Funding LLC DBA in New York as Midland Funding of Delaware LLC, Index No. 8173-2011

ANSWER: Defendant objects as the request is vague and ambiguous. Notwithstanding this and other objections, defendant denies. The check for the filing fee was cut on August 15, 2011 and as such was an expense incurred. Defendant cannot state when the clerk cashed the check.

## II. Interrogatories

1. State the name, address, title, and job description of each officer, director, partner, shareholder, and employer of Defendants who authorized, approved, or created the form of letter attached as Exhibit A to these discovery demands.

RESPONSE:   David A. Cohen, Esq., Partner.

2.      State the number, names and addresses of persons with New York addresses to which Defendants sent letters substantially similar or materially identical to the letter attached to these discovery demands as Exhibit A from March 9, 2011 through March 9, 2012.

RESPONSE: Defendant objects as the demand is vague, ambiguous and overbroad. Defendant states that it cannot determine with particularity which debtors/consumers may have received such correspondence.  Defendant objects s the demand seeks private, confidential information concerning debtors/consumers.  Release of this private information concerning debtors may very well violate the F.D.C.P.A. or other statutes and subject defendant to liability.   Notwithstanding these and other objections, defendant states that the names and addresses of debtors receiving such letters has been provided and is attached.

3.      State the number, names and addresses of persons with New York addresses to whom Defendants sent letters substantially similar or materially identical to the letter attached to these discovery demands as Exhibit A from March 9, 2011 through March 9, 2012, in which fees for filing a summons and complaint with a City Court were demanded.

RESPONSE: Defendant objects as the demand is vague, ambiguous and overbroad. Defendant states that it cannot determine with particularity which debtors/consumers may have received such correspondence.  Defendant objects s the demand seeks private, confidential information concerning debtors/consumers.  Release

of this private information concerning debtors may very well violate the F.D.C.P.A. or other statutes and subject defendant to liability. Notwithstanding these and other objections, defendant states that the names and addresses of debtors receiving such letters has been provided and is attached.

4. State the number, names and addresses of persons with New York addresses to whom Defendants sent letters substantially similar or materially identical to the letter attached to these discovery demands as Exhibit A from March 9, 2011 through March 9, 2012, in which fees for filing a summons and complaint with a City Court were demanded before the filing fees were received by the Court Clerk.

RESPONSE: Defendant objects as the demand is vague, ambiguous and overbroad. Defendant states that it cannot determine with particularity which debtors/consumers may have received such correspondence. Defendant objects s the demand seeks private, confidential information concerning debtors/consumers. Release of this private information concerning debtors may very well violate the F.D.C.P.A. or other statutes and subject defendant to liability. Notwithstanding these and other objections, defendant states that the names and addresses of debtors receiving such letters have been provided.

5. State the number, names and addresses of persons with New York addresses to whom Defendants sent letters substantially similar or materially identical to the letter attached to these discovery demands as Exhibit A from March 9, 2011 through March 9, 2012, in which fees for filing a summons and complaint with a City Court were

demanded before the filing fees were received by the Court Clerk, and who paid the filing fees demanded.

RESPONSE: Defendant objects as the demand is vague, ambiguous and overbroad. Defendant states that it cannot determine with particularity which debtors/consumers may have received such correspondence. Defendant objects to the demand seeks private, confidential information concerning debtors/consumers. Release of this private information concerning debtors may very well violate the F.D.C.P.A. or other statutes and subject defendant to liability. Notwithstanding these and other objections, defendant states that the names and addresses of debtors receiving such letters have been provided.

6. Describe, step-by-step, the process which resulted in the Letter being transmitted to Plaintiff, beginning with the date and method of transmission of debtor information to Defendants, including: computer tapes or other media delivered (when, by whom, where and to whom); content of computer tape or media; data input (where and by whom); computer entry or other means of directing transmission letters (where and by whom entry made), letter with debtor information printed (from where and by whom); letter with debtor information mailed (from where and by whom), computer tapes or media returned (on what occasion, when, by whom and to whom).

RESPONSE: Defendant objects to the demand as vague, ambiguous and overbroad and cannot be responded to in its present form.

29

7.      Describe, step-by-step, the process by which the Defendants determined the filing fee charged by New York State's City Courts in the Letter and added the filing fee to the total amount demanded in the Letter.

RESPONSE: Defendant objects.      The process for filing a summons and complaint in any given court is set forth in that Court's statutes, rules and/or regulations. The filing fee is set forth in the Court rules.

8.      State the net worth of each Defendant and, describe in detail, how it was computed.

RESPONSE: Defendant objects as the request is vague, ambiguous and overbroad.      Defendant further objects as the demand calls for irrelevant information. Defendant cannot respond to the request as it pertains to co-defendant. Defendant refers plaintiff to its responses provided in requests 30 through 51 above. Notwithstanding this and other objections, defendant states upon information and belief, that its net worth is less than $1,000.00 and defendant's calculation is based on the following formula: assets minus liabilities equals equity (net worth). Defendant presently has no retained earnings and owns no real property.      Defendant is presently operating with an outstanding loan/debt.

9.      Describe the contractual relationship between C&S and Midland.

RESPONSE: Defendant C&S has an attorney-client relationship with co-defendant, Midland.

10.      Describe all communications between C&S and Midland concerning Plaintiff.

RESPONSE: Defendant objects as such communications are protected by the attorney-client privilege. Notwithstanding this request, defendant is assigned the case for collection by Midland as reflected in the collection file attached. Defendant updates its collection file periodically to reflect the progress of its efforts.

11. Describe all communications between Defendants and Plaintiff, including date; participation, subject matter, regular or certified mail, telephone conversation or message, etc.

RESPONSE: Defendant objects to the demand as vague, ambiguous and overly broad. Notwithstanding this objection, defendant states, upon information and belief, that communication between plaintiff and defendant would consist of correspondence previously disclosed. Notwithstanding this and other objections, the defendant's collection file has been attached to these responses.

12. Describe Defendants' maintenance of procedures reasonably adapted to avoid violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.*

RESPONSE: Defendant objects to the demand as seeking information not relevant to the instant litigation. Notwithstanding this and other objections, defendant states that it maintains copies of the F.D.C.P.A. at its offices for reference and trains its employees on the proper manner to collect on debts. Copies of the cover pages of the materials utilized have been provided. Defendant engages in periodic training and retraining of its employees on debt collection and compliance with the FDCPA. **Defendant has attached additional material.**

31

13. If claiming that any noncompliance with the Fair Debt Collection Practices Act was the result of a bona fide error, describe all of the measures that you took to prevent or avoid the occurrence of this violation, including the dates that such measures were undertaken.

RESPONSE: See 12.

14. Identify all individuals having knowledge of the measures described in response to Interrogatory Number 13, and describe their involvement in those measures.

RESPONSE: Leandre John, Esq. and David Cohen, Esq. supervise the defendant's compliance with the FDCPA.

15. Describe any insurance covering Defendants for the conduct alleged in the Complaint, including policy limits.

RESPONSE: Defendant is insured by AIX Specialty Insurance Company, a member of the Hanover Insurance Group through a claims-made policy, number 10NY20007500201-SL PL, with limits of $3,000,000/$5,000,000 for a policy period 12/31/10 through 12/31/11.

16. Fully describe the computer hardware, software and storage media including, but not limited to, name, type, model or version number, location and manufacturer which Defendants use to store data for both active and inactive accounts concerning class members.

RESPONSE: Defendant objects as the demand calls for information that is confidential and proprietary in nature. Attached is a Confidentiality Stipulation. Defendant will provide a further response upon execution of the same.

17. Identify all persons, including former and current employees, involved in Defendants' efforts to collect on Plaintiffs account.

RESPONSE: Ed Aiken; John Lisa; Robert Shalofski; Veronica Aycock; Nicole Santana; Myriam Butler; Neal Traina; John Saslona; David Cohen. Of these, two are no longer employed. Ed Aiken, 194-06, 122nd Avenue, Springfield Gardens, New York 11413, and John Saslona, P.O. Box 719, Lindenhurst, New York 11757. The remainder are still employees of defendant.

18. Identify each person Defendants expect to call as an expert witness at trial and state: (1) the subject matter on which the expert is expected to testify, (2) the substance of the facts and opinions to which the expert is expected to testify, (3) a summary of the grounds for each opinion, and (4) the expert's qualifications.

RESPONSE: Defendant has not retained an expert at this time. Defendant reserves the right to supplement this response prior to the close of discovery.

19. Describe all real property owned by C&S and/or Midland between January 1, 2007 and the date of responding to these interrogatories and identify all appraisals of the value of the property.

RESPONSE: Defendant C&S owns no real property. Defendant has no knowledge of the assets of co-defendant.

20. Identify each asset owned by C&S and/or Midland between January 1, 2007 and the responding date to these interrogatories other than real property identified in response to Interrogatory Number 15, including assets jointly held, and including, without limitation, deposit accounts, investment accounts, retirement accounts, securities,

33

motor vehicles, furnishings and fixtures, office equipment, computers, and accounts receivable.

RESPONSE: Defendant owns no assets. Defendant has no knowledge of the assets of co-defendant.

21.     For each asset identified in response to Interrogatory Numbers 19 or 20, state the approximate value.

RESPONSE: Not applicable. See above.

22.     Identify and state the approximate amount of all of C&S's and/or Midland's debts, including debts jointly owed, and specifically identify all such debts that are owed to a shareholder, officer or director of the company.

RESPONSE: Defendant objects as the demand seeks confidential information. Defendant further objects as the demand seeks irrelevant information as no class has been certified.

23.     Specify each asset or liability identified in response to Interrogatory Numbers 19, 20, 21 or 22 that is jointly held or owed, state the circumstances under which it came to be jointly held or owed, identify each individual with whom the asset or liability is jointly held or owed, and state the relative percentage ownership or responsibility each entity has with respect to such asset or liability.

RESPONSE: Not applicable. See above responses.

24.     If C&S and/or Midland transferred any asset identified in response to Interrogatory Numbers 19, 20,2101' 22, state the circumstances surrounding the transfer and any consideration received, and identify all documents concerning the transfer.

34

RESPONSE: Not applicable. See above responses.

25. Identify any certified public accountant, auditor, or other professional who has prepared tax returns or financial statements on your behalf on or after January 1, 2007.

RESPONSE: Marcum Accountants Advisors, 10 Melville Road, Melville, New York 11747.

## Requests for Production of Documents

Plaintiff requests that Defendants C&S and Midland produce the following documents at The Law Offices of Kenneth R. Hiller, PLLC, 6000 North Bailey Ave, Suite 1A, Amherst, NY 14226. All documents must be Bates·stamped. These discovery demands are continuing so as to require supplementary answers if you obtain further information between the time answers are served and the time of trial. Copies will be made and the originals returned unless other arrangements are made. Please see above for instructions and definitions. If there are no such documents, please so state. If there are such documents, please list appended documents responsive to each request.

1. All agreements between C&S and Midland.

RESPONSE: Defendant objects as this demand calls for information that is protected by attorney-client privilege.

2. All documents concerning the authority granted to C&S by Midland regarding the collection of Plaintiffs alleged debt.

RESPONSE: Defendant objects as this demand calls for information that is protected by attorney-client privilege.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MICHAEL HALLMARK on behalf of
himself and all others similarly situated,

                                 Plaintiff,

vs.

COHEN & SLAMOWITZ, LLP
MIDLAND FUNDING LLC d/b/a
MIDLAND FUNDING OF DELAWARE LLC,

                                 Defendants.

_____

**No. 11-CV-842(WMS)(LGF)**

**CLASS ACTION**

**Declaration of Plaintiff's Attorney Brian L. Bromberg in
Support of Expedited Motion to Strike Supplemental Declaration of
Attorney Andrew C. Sayles and the Accompanying Exhibits,
to Impose Sanctions, and to Extend Plaintiff's Time to Respond**

Brian L. Bromberg, an attorney at law, hereby declares under penalties of perjury that the following statements are true to the best of his knowledge, information, and belief:

1.      I am an attorney licensed to practice in the State of New York, and I am admitted to practice before this Court.

2.      I am an attorney of record for the Plaintiff in this action, and I was appointed class counsel by order of this Court on September 16, 2013.

3.      Plaintiff commenced this action under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, *et seq*., for the Defendants' activities in connection with their collection of an alleged debt of the Plaintiff.

4.      Plaintiff now moves to strike the supplemental declaration of Attorney Andrew C. Sayles, filed on behalf of his client Cohen & Slamowitz, LLP, together with the exhibits attached

1

thereto, upon the grounds that they were filed without court permission; that they do not consist of "newly discovered evidence" by any stretch of the imagination, and thus cannot be submitted as part of C&S's Motion for Reconsideration; and that Mr. Sayles's and C&S's attempt to file them "under seal" without court approval violates Second Circuit precedent.

5.      Plaintiff submits that the actions of Mr. Sayles and C&S in filing these "supplemental" documents without court permission, at 4:49 p.m. on the Friday before Mother's Day – and less than one business day before Plaintiff's opposition papers were due on the motion for reconsideration – is sanctionable conduct.

6.      Counsel for C&S did not serve the unaudited financial statements attached to the supplemental declaration on my office until 3:23 p.m. on May 9, a little more than an hour before counsel's email to chambers purporting to file the supplemental declaration "under seal." A copy of the email I received from Mr. Sayles at 3:23 p.m. is attached as <u>Exhibit A</u>.

7.      I am also attaching as <u>Exhibit B</u> a copy of Mr. Sayle's email to chambers, showing that the papers were filed at approximately 4:49 p.m.

8.      I had spoken with Mr. Sayles by telephone, concerning a different discovery matter, approximately one hour before he served the unaudited financial statements on me by email. While Mr. Sayles did indicate that he was planning to serve discovery materials on my office later that day, he did not explain what these materials would be. Nor did he express his intention to file a supplemental declaration in support of C&S's pending motion for reconsideration.

9.      In light of the eleventh-hour submission of more than 100 pages of additional material that Plaintiff had not yet seen, which this Court may or may not consider to be part of

C&S's motion for reconsideration, Plaintiff also requests an extension of two weeks to respond to C&S's motion.

10.     In support of Plaintiff's motion, I am attaching as <u>Exhibit C</u> copies of the relevant pages from the transcript of oral argument held on April 2, 2014, in Buffalo, New York before the Honorable Leslie G. Foschio. These are the pages referred to in the accompanying memorandum.


Dated:  New York, New York
        May 12, 2014


                                        <u>/s/ Brian L. Bromberg</u>
                                        Brian L. Bromberg

Case 1:13-cv-00842-WMS-LGF Document 195-1 Filed 05/12/14 Page 1 of 2 PageID #: 269

# Exhibit A

## Brian L. Bromberg

| | |
|---|---|
| **From:** | Andrew C. Sayles <ASayles@connellfoley.com> |
| **Sent:** | Friday, May 09, 2014 3:23 PM |
| **To:** | brian@bromberglawoffice.com |
| **Cc:** | thomas.leghorn@wilsonelser.com; joseph.francoeur@wilsonelser.com; 'Seth Andrews' (sandrews@kennethhiller.com); 'Ken Hiller' (khiller@kennethhiller.com); jonathan@bromberglawoffice.com |
| **Subject:** | Hallmark v. Cohen & Slamowitz, et al |
| **Attachments:** | Hallmark_letter serving C&S financials_subject to confidentiality order.PDF; 2011_C&S consolidated.pdf; 2011_C&S Only.pdf; 2012_C&S consolidated.pdf; 2012_C&S only.pdf |

Brian,

Please see the attached letter and attachments producing financial statements on behalf of Cohen & Slamowitz subject to the Stipulation of Confidentiality ordered by the Court on May 8 and previously executed among counsel.

Thank you,
Andrew

**Andrew C. Sayles**
Partner
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Office: (973) 535-0500
Fax: (973) 535-9217
asayles@connellfoley.com
www.connellfoley.com

STATEMENT OF CONFIDENTIALITY: The information contained in this transmission including any attached documentation is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify Connell Foley LLP immediately by replying to this email. Please delete all copies of this message and any attachments immediately.

# Exhibit B

## Brian L. Bromberg

| | |
|---|---|
| **From:** | Andrew C. Sayles <ASayles@connellfoley.com> |
| **Sent:** | Friday, May 09, 2014 4:49 PM |
| **To:** | foschio@nywd.uscourts.gov |
| **Cc:** | brian@bromberglawoffice.com; thomas.leghorn@wilsonelser.com; jonathan@bromberglawoffice.com; joseph.francoeur@wilsonelser.com; 'Seth Andrews' (sandrews@kennethhiller.com); 'Ken Hiller' (khiller@kennethhiller.com) |
| **Subject:** | Hallmark v. Cohen & Slamowitz / Civil Action No. 11-cv-0842 |
| **Attachments:** | Hallmark_May 9 2014 letter to J Foschio.pdf; Hallmark_May 9 2014 Sayles Declaration.pdf |

Judge Foschio,

Pursuant to my discussion with Sandra Wilson this afternoon, attached please find a declaration and corresponding exhibits which Defendant Cohen & Slamowitz requests be filed under seal in connection with the pending motion for reconsideration.

Thank you,


**Andrew C. Sayles**
Partner
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Office: (973) 535-0500
Fax: (973) 535-9217
asayles@connellfoley.com
www.connellfoley.com

STATEMENT OF CONFIDENTIALITY: The information contained in this transmission including any attached documentation is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please notify Connell Foley LLP immediately by replying to this email. Please delete all copies of this message and any attachments immediately.

# Exhibit C

1  document requests again, please.  We can see those at 73-1

2  starting at page 33?

3         MR. BROMBERG:  Yes.

4         THE COURT:  Now, couple of preliminary questions.

5  Assuming that the case survives summary judgment as to

6  liability and I'm just speaking just -- I don't have non-

7  dispositive -- dispositive referral authority.  In fact, that

8  really brings up a point about that motion to strike.  That

9  may have to be refiled in front of Judge Skretny.

10        MR. SAYLES:  Incidentally, Your Honor I was not under

11 the assumption that that was being heard today.  I don't

12 believe Mr. Leghorn was, either.  Obviously, we'd be prepared

13 to discuss it, if it is.

14        THE COURT:  What, you didn't think --

15        MR. SAYLES:  The motion to strike.

16        THE COURT:  Oh.  Only -- not really.

17        MR. SAYLES:  Okay.  We didn't think it was being

18 heard today.

19        THE COURT:  No, don't worry about it, but I'm just,

20 you know, filling in gaps here.  Okay.

21        MR. SAYLES:  Okay.

22        THE COURT:  Assume for the sake of discussion that

23 there's a motion after we complete discovery, which is what

24 we're here for, especially since the 2nd Circuit has denied

25 the appeal as I told you they would or told your predecessor

1    they would.  Mr. Leghorn would want to hear this question.

2    Who has the burden at trial to establish or disestablish the

3    defendant's net worth as being negative net worth?

4         MR. BROMBERG:  I believe it would be the defendant's

5    obligation to show that they have some kind of cap less than

6    the $500,000 cap because it would be -- the general rule is --

7         THE COURT:  And you know that because you've read the

8    Harris vs. D. Scott Carruthers case, right, which cited your

9    favorite case, right Mr. Bromberg?

10        MR. BROMBERG:  It's been a while since I read the

11   Harris case, but --

12        THE COURT:  Well, I mean, the Harris, case 270 F.R.D.

13   446 at page 454 says quite thoroughly that in regard to an

14   FDCPA class certification motion, quote, defendants have the

15   burden of demonstrating their negative net worth, unquote.

16        MR. BROMBERG:  Right.

17        THE COURT:  Why are we talking about it,

18   Mr. Bromberg?

19        MR. BROMBERG:  Well, because it's going to become an

20   issue down the line.  In other words --

21        THE COURT:  Well, okay.

22        MR. BROMBERG:  We have already --

23        THE COURT:  I'm really trying to be helpful here.

24   Let me just say, preliminary to my next question, I'm very

25   inclined to follow the general holding or thrust, if you will,

1   of Judge Schroeder's decision.  Now, having said that, how,

2   looking at Mr. Sayles, are you going to show that you have

3   negative net worth?  That is your position, isn't it?

4        MR. SAYLES:  The position was the net worth was

5   minimal.

6        THE COURT:  I see.  Where is that resounding

7   affirmation of the financial health of the defendant stated in

8   the record, Mr. Bromberg?

9        MR. SAYLES:  Your Honor, if I may on that point, we

10  intend to produce financials or financial reports from Cohen

11  and Slamowitz's accountants attesting to their 2011 and 2012

12  net worth which will summarize their balance sheets and all

13  the information that was prepared in accordance as part of

14  their tax returns for these years as well.  That will reflect

15  the net worth for Cohen and Slamowitz and it will show that it

16  is nominal.  These -- I don't have the --

17       THE COURT:  Well, those would be -- so, you're happy

18  to provide certified or audited balance sheets?

19       MR. SAYLES:  I don't know if -- I've seen the copies.

20  I don't believe it's an audited financial sheet.  I don't --

21       THE COURT:  Is it certified?

22       MR. SAYLES:  I believe I could have it certified by

23  an accountant.  I don't want to speak out of turn, but I've

24  discussed this with the appropriate parties and I believe I

25  could get something, if not certified, an affidavit to the

1  effect saying they prepared this, which is what I provided.

2       THE COURT:  And the certification would be that the

3  document has been reviewed and is found to be a document

4  prepared in accordance with the Court would accept as general

5  accounting principals?

6       MR. SAYLES:  Correct.  I believe that and I don't

7  want to put words in -- the report would be consistent with

8  the case law, what the Godson case and similar cases require.

9  Obviously, we want to produce that subject to the

10 confidentiality order to be in place but once the class is

11 certified, I agree that that's a relevant issue at the very

12 least.

13      THE COURT:  And if we directed your tax returns as

14 Judge Schroeder did as well, that's not a problem either?

15      MR. SAYLES:  Well, I believe the accountant's

16 statement would be sufficient on that grounds, but I do --

17      THE COURT:  I have Judge Schroeder's decision and

18 obviously a magistrate judge just down the hall from another

19 magistrate judge who has a published decision on it is very

20 reluctant, shall we say, to go beyond the four corners of his

21 learned colleague.

22      MR. SAYLES:  I fully understand.

23      THE COURT:  Put yourself in this Court's shoes.  You

24 can, of course, appeal to the district judge who can always

25 say that no, Judge Foschio, you got it wrong, even though

1    the -- neither the plaintiff nor the defendant as far as I

2    know in Judge Schroeder's case appealed to Judge Skretny.

3    Interesting.

4            MR. SAYLES:  Point well-taken, Your Honor and I'm

5    familiar with that.

6            THE COURT:  Thank you.  Yes.  So, that being -- so,

7    I'm trying to really understand this issue.  I've done a lot

8    of homework on it, as you can begin to tell and I've thought

9    about it.  So, help me out here, Mr. Bromberg.

10           Why, if we direct what Judge Schroeder directed --

11   maybe with some bells and whistles associated with it -- and

12   you think that they're still hiding assets which undermine the

13   credibility of the document, if not the certification, can you

14   not serve them if discovery has not been completed with a

15   contention interrogatory that solves your problem?

16           MR. BROMBERG:  We could.  The interesting thing about

17   the decision and --

18           THE COURT:  And you've obviously thought about this

19   and I'm wondering whether this has been done elsewhere, in

20   which the interrogatory was asked and having received these

21   documents, particularly the balance sheet -- balance sheets,

22   please state the facts, evidence and law upon which the

23   defendant intends to or will rely on at trial to establish

24   that its net worth is below zero or thereabouts.  Wouldn't

25   that solve the problem?

1          MR. BROMBERG:  Might be a good approach, Your Honor

2    and I know in the Godson decision --

3          THE COURT:  And used before?  Could it be -- you said

4    it's a good approach.  Well, obviously, you're an expert.  You

5    think you've struck on something here?

6          MR. BROMBERG:  I'm looking for a way to deal with the

7    situation --

8          THE COURT:  So am I.  So am I.  It's an interesting

9    point, but my job is to enforce discovery.  I can't conduct

10   satellite litigation, I don't think, unless you've got some

11   case law that says that I can and should in this type of

12   situation, call the preparers of these balance sheets to this

13   Court under oath, put them into that witness box and let you

14   examine them on the underlying authenticities of these

15   documents.

16         MR. BROMBERG:  The problem, Your Honor, right now is

17   we have a certified class which is something we didn't have in

18   Godson and then, we actually have a certified class.  In

19   addition, we don't have --

20         THE COURT:  It's not a timing issue.  Stick with the

21   nub of what I'm getting at here.  I don't see anything in

22   Judge Schroeder's decision that allows me to grant your

23   motion.  I just said that to you at the outset.  I'm trying to

24   help you here.  You knew right along that they have the

25   burden.  If they had the burden, then why do you need to take

1    the discovery?

2         MR. BROMBERG:  Because right now, we're shooting in

3    the dark.  Right now, all we have is the response and --

4         THE COURT:  Well, if you serve them with a request,

5    once you get the document and ask them to provide the

6    underlying documentation upon which this is based, you haven't

7    even seen this balance sheet yet.

8         MR. BROMBERG:  Are they going to be audited?

9         THE COURT:  I don't know.  I mean, I'm looking at

10   Judge Schroeder's decision.  It says audited.  Waiting for a

11   response from -- to talk about it momentarily.  You can see

12   that that word audited creates a potential problem but

13   interestingly, there was no appeal of Judge Skretny's ruling.

14   So, in that case, there must have been -- they must have been

15   audited.  I don't know.  Maybe they're a public company so

16   they were audited, maybe they weren't.

17        MR. BROMBERG:  I mean, audited could be key here.  I

18   mean, if we've got someone saying -- coming in and saying

19   we've have conducted an audit, these are good --

20        THE COURT:  Yeah.

21        MR. BROMBERG:  -- that changes the dynamic.

22        MR. SAYLES:  Your Honor, if I may, there's an expense

23   that's certainly associated with an audit process and if I

24   follow Your Honor's previous comment, you're inclined to order

25   the production of income tax returns as well.  Those would be

1    documents filed with the IRS.  It's attesting the same

2    information that would be within the balance sheet.

3              THE COURT:  That might be the statute.

4              MR. SAYLES:  And I would -- I believe in Godson and

5    again, there wasn't enough background available from the

6    decision, but I know they're audited reports, but I didn't

7    read the decision to say that the fact they were audited

8    mattered.  I just think that --

9              THE COURT:  The statute also talks about, under

10   1692(K)(b)(2), it says that in determining damages, the Court

11   can consider the financial resources of a debt collector.  So,

12   I'm not sure I'm -- I mean, at a minimum, I'm thinking what

13   Judge Schroeder has done is probably the law of the land, but

14   I'm wondering, you know, what's your position about this audit

15   and if -- once we hear about that, I'm wondering whether we

16   can't also require or should require profit and loss

17   statements, income statements, cash flow statements and a

18   current trial balance for the current year?

19             MR. BROMBERG:  I agree.

20             THE COURT:  We've been down this path, not in an

21   FDCPA case.

22             MR. SAYLES:  I think if we reviewed the Godson case

23   which cites to the Sanders matter --

24             THE COURT:  Sanders doesn't give us any guidance on

25   the discovery issue.

 1          MR. SAYLES:  Well, it did speak to the net worth

 2     issue.

 3          THE COURT:  Yes, it did, but we're beyond that.  So,

 4     I mean -- and plus, I've got Judge Schroeder's decision

 5     construing Sanders.  There's nothing in the two case cites

 6     that is contrary to what he did.  In fact, they're both very

 7     consistent.  The Malo (phonetic) case and the other case name

 8     escapes me, right?  You read those cases?

 9          MR. SAYLES:  Yes and I could comment that the report

10     that I've seen contains a --

11          THE COURT:  How do I get around the audit

12     requirement?  We all know that there's a distinction between

13     certified and audit.

14          MR. SAYLES:  Well, I believe the -- to offer the

15     initial production here, if Your Honor is ordering production

16     of income tax returns along with the statement from the

17     accountants to that effect, I believe the information out

18     there is -- will be adequate to establish net worth.  It's

19     detailed.  It's not a one-page statement saying --

20          THE COURT:  Well, I'm not sure about that.  It's not

21     clear to me how a tax return establishes anything with respect

22     to the financial condition of the taxpayer.

23          MR. SAYLES:  It does reflect the document filed with

24     the IRS subject to --

25          THE COURT:  Well, but you're not focusing on my

1  question.  What is there in a corporate tax return or a

2  partnership return that directly is probative of the financial

3  condition of the filer?

4          MR. SAYLES:  Well, the balance sheets would --

5          THE COURT:  They're not part of the return.

6          MR. SAYLES:  The balance sheets prepared, the

7  corporate balance sheets relied upon by the accountant to

8  prepare the income tax return.

9          THE COURT:  The what sheets?

10         MR. SAYLES:  The corporate balance sheets -- and I'm

11  using that term loosely -- the information compiled by the

12  accountant, the balance sheets that they rely upon to prepare

13  their information, the tax returns and this report that we're

14  offering to provide, it effectively --

15         THE COURT:  The balance sheets that helps them

16  prepare a tax return.

17         MR. SAYLES:  It show assets and liabilities.

18         THE COURT:  Is that required in a partnership return?

19         MR. SAYLES:  Well, no.  The partnership return

20  would --

21         THE COURT:  The partnership return, like any return,

22  demands information on revenue and deductions.

23         MR. SAYLES:  Yes.  It shows money that --

24         THE COURT:  Income.  Income is only one element.

25  It's one small element in many circumstances of a balance

1    sheet.

2           MR. SAYLES:  But we also have the case law guidance

3    that the net worth is based on the balance sheet which would

4    be the assets and the liability.

5           THE COURT:  Yes, including cash, which may be

6    minimal.

7           MR. SAYLES:  Yes.

8           THE COURT:  But unless they're bankrupt, then there

9    must be other assets which exceed liabilities.  As far as I

10   know -- and you help me out here, I may be wrong -- does

11   anybody know whether or not such information is reportable or

12   is required to be reported on an LLC's tax return?

13          MR. SAYLES:  As a matter of fact, it's an LLP, Your

14   Honor.

15          THE COURT:  LLP, same difference, limited

16   partnership.

17          MR. SAYLES:  I'm not aware.  I haven't personally

18   seen the income tax returns for the corresponding years.  I

19   have seen the accountant's report.

20          THE COURT:  Well, do they have or do they not have

21   audited balance sheets?

22          MR. SAYLES:  I do not believe they have audited.

23   What I have been provided is a financial sheet.  I don't

24   believe they --

25          THE COURT:  What is it and who prepared it?

```
 1              MR. SAYLES:  Pardon?

 2              THE COURT:  What is it and who prepared it?

 3              MR. SAYLES:  It was a report prepared by their

 4   accountant, Markham and Associates which outlined their net

 5   worth for 2011.  It identified assets, income, things like

 6   that, information and basically provides a picture of their --

 7              THE COURT:  I'm sensitive to the issue of audited

 8   because we know that many small businesses don't have audited

 9   financials.  This doesn't sound like an -- what is their

10   annual revenue?

11              MR. SAYLES:  I don't know that off the top of my

12   head, Your Honor.

13              THE COURT:  Did you do a -- is there a Dun and

14   Bradstreet available for C&S, Mr. Bromberg?

15              MR. BROMBERG:  I haven't tried running a D&B on them,

16   Your Honor.  There's a privately-held company.

17              THE COURT:  Well, that doesn't mean anything.  That's

18   what D&B is for.  That's exactly what you use D&B for,

19   otherwise you go to the SEC and look up the case.

20              MR. BROMBERG:  Good point.  I haven't tried running a

21   D&B on them.

22              MR. SAYLES:  Your Honor, I would suggest as an

23   initial process, start with the information that was ordered

24   in Godson and I believe it's adequate.  I believe it's

25   comprehensive.
```

```
 1          THE COURT:  Well, that requires you to file -- to

 2   serve audited balance sheets.

 3          MR. SAYLES:  Well, I guess under that caveat --

 4          THE COURT:  And you're now on the record as saying

 5   just order what Godson --

 6          MR. SAYLES:  Well, no, Your Honor.  I understand

 7   Godson to require that information, but I think the audit

 8   aspect was incidental.

 9          THE COURT:  Well, you talked to Judge Schroeder about

10   that?

11          MR. SAYLES:  I didn't.

12          THE COURT:  Well, if you know Judge Schroeder, he

13   doesn't order incidental information.

14          MR. SAYLES:  Well, I don't mean his statement was

15   incidental.  What was presented to him were financials that

16   happened to be audited.

17          THE COURT:  No, I don't think anything was presented

18   to him.  I think that is what was at issue.  He was asked to

19   allow for production.  Where is that decision?  Oh, I see your

20   point.  The defendant agreed to reproduce a copy -- agreed to

21   produce a company of its audited balance sheets subject to a

22   protective order.  Why was there a motion in front of him?

23   Oh, I see, because the plaintiff wanted more, apparently.

24          MR. SAYLES:  Your Honor, incidentally, I don't have

25   the specific case, but the documents I'm speaking about have
```

1  been accepted in the Eastern District of New York case subject

2  to a confidentiality order on behalf of Cohen and Slamowitz as

3  to their net worth.  I don't have that matter before me, but I

4  can't tell you they have been submitted in other litigations.

5          THE COURT:  So, you're -- what you mean by so -- so,

6  this puts some meat on the bones here about the incidental

7  aspect of Judge -- what you're really saying is that he didn't

8  reach the merits of the question of whether audited was

9  required because of the defendant's proffer?

10         MR. SAYLES:  They haven't -- they were already in

11  existence.  It wasn't the issue of whether they had to --

12         THE COURT:  All right.  Well, that's good enough.  I

13  think so.  So, what authority do you have that they have to be

14  audited under the FDCPA?

15         MR. BROMBERG:  Well, it would just be -- well, the

16  leading case on the entire issue is the 7th Circuit case of

17  Sanders v. Jackson which says that net worth is book value net

18  worth --

19         THE COURT:  Not market value.

20         MR. BROMBERG:  -- Not market value.  Now, the

21  question is what is the book value.

22         THE COURT:  That's excluding good will.

23         MR. BROMBERG:  Well, actually, that's a frequent

24  misreading of Sanders v. Jackson.

25         THE COURT:  Well, I don't know.  I've read it a

1   couple times.  I couldn't see any way around it.

2          MR. BROMBERG:  Now, there's some loose language in

3   there and this is entirely aside --

4          THE COURT:  I know, I know.  Go ahead.  Make your

5   point.  We have to move on.

6          MR. BROMBERG:  Okay, okay.  My point though is there,

7   they actually had books and I don't think they indicated one

8   way or another whether they were audited.  I'd have to go back

9   and look.  I'd have to go back and double check.  I haven't

10  read Sanders v. Jackson in a couple months, but the

11  question -- there is a key question here if all we're getting

12  is something coming from their accountant, that is, by its

13  nature, something that's not -- that hasn't been examined by a

14  third party.

15         It's been examined by a party that's been hired by

16  and works frequently with the defendant and there's no clarity

17  on what's actually there.  Unless we, ourselves, can examine

18  the underlying documents, we have no way of relying on what's

19  been presented to us by their own accountants.

20         THE COURT:  What case says that you're entitled to

21  more than what Judge Schroeder provided?

22         MR. BROMBERG:  Well, Judge Schroeder said audited.

23         THE COURT:  Well, no.  I mean, you're saying that if

24  they were audited, then you wouldn't have made all these

25  document requests and interrogatory demands?

 1          MR. BROMBERG:  If they were audited, we'd be hard-

 2     pressed to go far beyond maybe asking for say, three years of

 3     tax returns with schedules.  I think if they produced audited

 4     tax returns, it makes it very difficult to argue against the

 5     book value net worth as represented in the audited tax

 6     returns.  I had this come up on a case recently where the

 7     defendants produced audited returns and we basically decided

 8     we weren't going to fight what was on the audited returns.

 9     You're not going to -- you know --

10          THE COURT:  Well, you can see from the Court's point

11     of view that we, you know -- your discovery requests do

12     challenge the notion of creating satellite litigation in which

13     you're attempting to second guess, for example, the tax

14     returns, which was the issues in the Malo (phonetic), case in

15     the Eastern District.

16          MR. SAYLES:  Your Honor, if I may add, in Godson,

17     Judge Schroeder cites to Miller vs. Abrams, Eastern District

18     of New York case rejecting discovery demands effectively

19     seeking to audit defendant's tax returns.  What Mr. Bromberg

20     just explained, he's effectively seeking to perform his own

21     audit of their returns.  So, we've got an Eastern District

22     case cited by --

23          THE COURT:  Well, that's it.  There's more than an

24     echo of concern among judicial officers who have confronted

25     the issue about opening the door into collateral litigation

1    but I -- and so, that's what made me ask the question of who

2    ultimately bears the burden?  And you know, the question I

3    suppose is, at trial, if they bear the burden, they come in

4    with this in-house accountant or maybe outside accountant who

5    says, I prepared these returns in the course of ordinarily,

6    you know, general, accepted accounting principals and explains

7    to the jury what those are and how he went or she went about

8    it and then, you cross-examine.

9            Your point is that unless you get discovery, you

10   aren't in a position to cross-examine perhaps and undermine

11   their effort to meet their burden?

12           MR. BROMBERG:  Well, yes.  And there's another

13   problem here which is that --

14           THE COURT:  What about, again, the idea of first

15   getting the documents, either in audited or unaudited -- well,

16   you just said if they're audited you don't need to do it, but

17   even if they're unaudited, does that follow with contention

18   interrogatory and then depose the accountant?

19           MR. BROMBERG:  Well, I think it would take more than

20   a contention interrogatory.  We may have to see the underlying

21   documents because the problem is, their responses to the

22   discovery demands are really out there, Your Honor and we've

23   got here, notwithstanding this and other objections, defendant

24   states upon information and belief that its net worth is less

25   than $1,000 and defendant's calculation is based on the

Case 1:14-cv-01063-WMS-JGM Document 195-12 Filed 05/12/14 Page 19 of 37
Case 1:14-cv-01063-WMS-JGM Document 195-12 Filed 05/12/14 Page 19 of 37 #: 291
HALLMARK V. COHEN, ET AL - ORAL ARGUMENT
66

1  following formula:  Assets minus liabilities equals equity net

2  worth.  That was response to Interrogatory Number 8.  We're

3  talking about one of the largest debt collection law firms in

4  the state.

5       THE COURT:  That's why I asked you about the Dun and

6  Bradstreet.

7       MR. BROMBERG:  There's other places where they -- I'd

8  have to look up -- hold on.  Where is it?  There's one in here

9  where they actually say they have no assets.

10      THE COURT:  Have you -- one of these cases referred

11 to, I think the one, I just cited to you, this Miller case,

12 Miller vs. McCollough, Eastern District of Illinois --

13 Northern District of Illinois, for the record 198 F.R.D. 503

14 2001 case in which Judge Bucklo referred to the relevance of

15 the resources of the debt collector as statutorily relevant to

16 the question of what the damages should be.

17      And she points out that the defendant's own

18 Martindale-Hubbell listing, the McCollough Law Firm described

19 itself as, quote, the premier mortgage banking firm in the

20 State of New York, end quote.  Even allowances -- making

21 allowances for self-promotion, this is not a mom-and-pop

22 business.  9,000 people were affected by their misconduct.  I

23 mean, my point is that, aren't there -- isn't there

24 publically-available information about C&S that is going to

25 put the credibility of the assertion that they have zero net

```
 1   worth, you know, at some risk in front of a jury?

 2          MR. BROMBERG:  It gets better.  We've got here,

 3   identify each asset owned by C&S and/or Midland.  That's

 4   Interrogatory Number 20.  We have, as a response, defendant

 5   has no assets.  Defendant has no knowledge of the assets of

 6   co-defendants.  They've got offices out in Suffolk County.

 7   Someone owns the offices.  Someone has some relation to Cohen

 8   and Slamowitz.  I mean --

 9          THE COURT:  Why do you say that?  Isn't there such a

10   thing as leases?

11          MR. BROMBERG:  Okay.  Well, let's see copies of the

12   leases, Your Honor.  We also know that they have --

13          THE COURT:  Or ask them if they, you know, if their

14   office is under lease.  Did you ask?  Is that one of your

15   questions?

16          MR. BROMBERG:  Yes.  We asked about leases, we asked

17   about assets, we asked about real estate owned, we asked

18   about -- and every response has been, we've got nothing.  I

19   mean, they have no assets?  They don't have a paperclip, Your

20   Honor?  I've received papers directly from Cohen and

21   Slamowitz.  They must have a paper clip.  They must have

22   staples.  I have received stapled papers.  I mean, this is

23   just outrageous.  So, that's the reason why we need audited.

24   I mean, just the responses on the face are shocking.

25          THE COURT:  Contract providers, triple-net contract
```

1   providers?

2           MR. BROMBERG:  Well, we know that --

3           THE COURT:  I understand your point.

4           MR. BROMBERG:  We know that Mr. Slamowitz and

5   Mr. Cohen have some involvement with a company by the name of

6   Empire Portfolio which is a major debt buyer in New York.  So,

7   somewhere -- the money is being channelled somewhere.

8           THE COURT:  Yeah.

9           MR. BROMBERG:  The back office work is being done by

10  some entity related to Mr. Cohen and Mr. Slamowitz and to the

11  Cohen and Slamowitz firm.  The assets are held somewhere in

12  some company related.  This company has been in business for

13  decades.  I don't know what to do here.  Without audited

14  financial statements, if they -- you know, if they --

15          THE COURT:  Have you consulted a forensic accountant

16  in connection with this problem?

17          MR. BROMBERG:  Well, this is -- these questions about

18  the assets and liabilities were developed by a colleague of

19  mine who consulted with an accountant in developing them.  So,

20  you know, saying this is what you need, essentially, they're

21  forcing us to conduct an audit when they give responses like

22  we have no assets, we have no lease, we have no real property,

23  we have no -- we have nothing.

24          MR. SAYLES:  That's a misstatement.  I don't think

25  there's ever a denial that we have no leases.  They were asked

1    to identify their assets.  If they owned a building, they

2    would have reflected it in there.  It's just a fishing

3    expedition, respectfully.  They're trying to gather

4    information beyond what Cohen and Slamowitz has advised.  I

5    know the number is low, but, Your Honor, I've represented a

6    number --

7            THE COURT:  Well, if you're -- I mean, I -- I'm not,

8    you know, I'm not asking you to answer this question, but if

9    the situation were reversed, Mr. Sayles, how would you cross-

10   examine the position your client is taking?

11           MR. SAYLES:  I would want to see the financials that

12   we've offered to produce.  I don't see a need --

13           THE COURT:  That's right, unaudited.  And then, how

14   are you going to cross-examine that accountant who prepared

15   them when it comes trial or in a deposition for purposes of

16   summary judgment?  I guess this cap issue could be the

17   candidate for summary judgment as well in theory.

18           MR. SAYLES:  The numbers are supported, they'll go

19   out -- they will be to the abilities of Mr. Bromberg

20   whereas --

21           THE COURT:  No, no, no.  I mean, just imagine

22   yourself in the opposite chair for a second as a (sic)

23   opponent.  How would you cross-examine that accountant unless

24   you had the underlying facts, evidence, legal theories,

25   accounting principals upon which he or she prepared those

1  unaudited financials?

2       MR. SAYLES:  Well, the case law provides that the net

3  worth determination needs to be subject to the GAAP.

4       THE COURT:  Exactly.

5       MR. SAYLES:  It's a standard that you can base your

6  examination upon.  It's a guidepost, just like you would do in

7  any other case involving a standard of care.  You base it on

8  that and the information provided will detail what information

9  is relied upon to reach those conclusions, but we read the

10  case law now that shows what needs to be provided as a -- to

11  establish net worth, we're willing to do that.  What isn't in

12  here is a basis to go beyond that.  Right now, it's

13  speculation as to ulterior motives.

14       THE COURT:  Well, unfortunately, the case law says

15  audited; the case law that I feel bound by.

16       MR. SAYLES:  But as I've been discussing, I believe

17  that was just in the -- the financials in Godson just happened

18  to be audited.  There's wasn't a dispute as to whether they

19  had to be audited or not.  That wasn't what was being

20  presented at all.

21       THE COURT:  Well, we can go one of two ways here.

22  Either you provide audited statements and I'm going to apply

23  Judge Schroeder's ruling or I'll let you provide unaudited

24  statements and permit further discovery via the plaintiff,

25  including contention interrogatories and depositions of the

1     accountant.

2              MR. SAYLES:  Following production of the --

3              THE COURT:  Yeah.

4              MR. SAYLES:  -- returns and the statements?

5              THE COURT:  And without prejudice to further

6     discovery request if I'm satisfied that the production that is

7     obtained without an audited statement is inadequate to the

8     purpose of permitting a fair trial on the issue of negative

9     net worth.  I don't know what else to do.

10             MR. SAYLES:  And my problem with an audited statement

11    is that it creates a severe financial burden on Cohen.  It's

12    probably 25 to $50,000 to audit the financials for a given

13    year and we have a class that spans 2011 and 2012.

14             THE COURT:  Is that the relevant time period,

15    Mr. Bromberg?

16             MR. BROMBERG:  The relevant time period --

17             THE COURT:  For discovery purposes?

18             MR. BROMBERG:  It's March 9th, 2011 through March

19    9th, 2012 is the class period.

20             THE COURT:  Is that the only period for which damages

21    can be calculated?

22             MR. BROMBERG:  The case law is not clear as to what

23    period you fix the net worth for purposes of --

24             THE COURT:  Under the statute, under however the

25    statute reads relative to calculation -- oh, I see.  Because

1    he's argued -- you agree this -- we're just talking statutory.

2    So, it's only the violations that occur within the class

3    period, is that it?  Is that relevant for purposes of

4    calculating?

5         MR. BROMBERG:  Well, no, no, no.  The -- okay.  We've

6    got --

7         THE COURT:  I mean $1,000 per plaintiff because only

8    one letter was received.

9         MR. BROMBERG:  It says $1,000 in statutory damages --

10        THE COURT:  Per member of the class?

11        MR. BROMBERG:  -- per --

12        MR. LEGHORN:  No, Your Honor, that's only the

13    individual.

14        MR. BROMBERG:  No, no, no.  It's -- okay.

15        THE COURT:  What is it?

16        MR. BROMBERG:  It's $1,000 to the class

17    representative plus possibly some kind of an award for having

18    stepped forward and represented the class, but it's $1,000 in

19    statutory damages to the class representative, plus any actual

20    damages.  With respect to the class, it's up to $500,000 in

21    statutory damages.

22        THE COURT:  That's my point, but you start by doing

23    the arithmetic of multiplying the number of persons in the

24    class times $1,000 don't you?

25        MR. BROMBERG:  No.  Actually, there's case law.  I

1    think all the cases that have addressed this issue have said,

2    for instance, where you've got $500,000 in potential statutory

3    damages, if there are only 20 class members, they can actually

4    get more than $1,000 each in statutory damages.

5              THE COURT:  Really?

6              MR. BROMBERG:  Well, actually, not 20 because then

7    you run into the amount --

8              THE COURT:  But the amount of damage is a function of

9    multiplier.  The multiplier is the number of class

10   representatives to determine potential damages, correct?

11             MR. BROMBERG:  Well, no.  Actually, it's --

12             MR. LEGHORN:  Your Honor, may I?

13             MR. BROMBERG:  In an individual case to the class

14   representative, the class representative can only recover --

15             THE COURT:  I know that.

16             MR. BROMBERG:  Yeah.

17             THE COURT:  I'm talking about the class members.

18             MR. BROMBERG:  The class members can take $500,000

19   divided by how many class members there are and the $1,000 cap

20   doesn't apply.  If there are one or two --

21             THE COURT:  So, in a class action, you're not

22   multiplying, you're dividing?

23             MR. BROMBERG:  Right.

24             THE COURT:  Oh, I didn't know that.

25             MR. SAYLES:  That's why it's a cap.

 1           MR. BROMBERG:  There's at least one case out of I
 2    believe the --
 3           THE COURT:  I thought it was the other way around,
 4    that you would multiply and then, you would find that it
 5    exceeds $500,000 and you would limit it to 500,000 and then,
 6    you'd divide into 500,000.
 7           MR. BROMBERG:  If you happen to have fewer than 500
 8    class members, that they could actually, in theory, recover
 9    more than $1,000 and I believe there was a case in the Eastern
10    District of Pennsylvania where people received more than
11    $1,000 per class member.  I don't recall the name of the case
12    off the top of my head.
13           THE COURT:  Okay.
14           MR. BROMBERG:  Okay.
15           THE COURT:  So, where are we?
16           MR. SAYLES:  I believe Your Honor presented two
17    options to me.
18           THE COURT:  Well, I don't know what other options
19    there are.  Is there another option?
20           MR. SAYLES:  I believe the option is to provide the
21    information that Cohen and Slamowitz has right now and if
22    there's future objections or issues that arise based on that,
23    then we can address it.  I understand Mr. Bromberg hasn't seen
24    the information, so it's difficult to ask him to speak to
25    their sufficiency or adequacy about having seen it, but I

1  would represent that to go further and impose additional

2  requirements without having that information out there right

3  now would be prejudicial to my client because --

4           THE COURT:  So, if you're talking $50,000 and Cohen

5  and Slamowitz, the question is whether or not that expense to

6  produce discoverable material is out of bounds under Rule 26.

7  In other words, does the cost, i.e. burden to the requested

8  party, does that outweigh the probative value under Rule 26?

9           As you know, there's a balancing test now the Court

10  has to apply; outweigh the probative value to the plaintiff.

11  If the probative value to the plaintiff is that, in theory,

12  the recovery goes from $0 per plaintiff or a matter of

13  pennies, to -- how many plaintiffs do we have here again?

14           MR. BROMBERG:  That's a good question.

15           THE COURT:  Ballpark.

16           MR. BROMBERG:  It's either 17,475 or 38,325.  We're

17  not clear at the moment.

18           THE COURT:  Well, that's still a relatively small

19  number.

20           MR. BROMBERG:  True.

21           THE COURT:  When divided into 500,000, but it's

22  better than nothing and I'm not -- and I know the answer to

23  this question is that no judge has opined on whether that's an

24  appropriate expense to impose on the defendants with that type

25  of potential maximized recovery for a plaintiff.  Do you

```
 1   follow me?

 2         MR. SAYLES:  Incidentally, Your Honor, the

 3   recovery --

 4         THE COURT:  In other words, $50,000 -- I don't even

 5   know if he's right about that.  It could be high, it could be

 6   low.  I don't really know.  I should probably get on the phone

 7   and call my accountant at a well-known local firm and ask what

 8   would, you know -- because we don't know what the revenue is.

 9   We don't, you know -- so, it's very inspective at this point.

10   But imposing that burden on them for the potential

11   maximization of damages, i.e., $25 per plaintiff or

12   thereabouts.

13         MR. SAYLES:  Incidentally, Your Honor, the cap would

14   be 1 percent of the net worth.  Even -- and I don't -- I

15   believe even if Cohen said --

16         THE COURT:  Or the lesser of?

17         MR. SAYLES:  Yeah.

18         THE COURT:  Yeah.  But, I mean, in theory, I'm just

19   trying to gross it up here.  In theory, the maximum recovery

20   could be $500,000.

21         MR. BROMBERG:  Well, I mean, Your Honor, in theory,

22   they could --

23         THE COURT:  Or less.  It could even ratchet down to

24   be smaller number.  I agree with you, Mr. Sayles, on that.

25         MR. SAYLES:  Your Honor, presumably it would cost
```

 1    less than 50,000 to photocopy the documents that we've asked

 2    for, turn them over, we go to our account and have them look

 3    at them.

 4            THE COURT:  Point made.

 5            MR. SAYLES:  But those are -- there's a breadth of

 6    information that there's some entitlement of confidentiality

 7    and privacy because especially where the defendants are sued

 8    for --

 9            THE COURT:  No, that's -- no, no, no.  We have a

10    confidential agreement.  It's not an issue.

11            MR. SAYLES:  But the case law that exists does not

12    require more than production of the returns.  I know Godson

13    didn't have happen to involve a (sic) audited financial, but

14    it wasn't the threshold.  Nothing in that decision suggests

15    that the audited nature of those financials --

16    (An off-the-record discussion was held.)

17            THE COURT:  One of the cases is cited by Judge

18    Schroeder, I forget which, I think it's Malo, it refers to

19    financial documents.  It doesn't actually say what Judge

20    Schroeder says it says about tax returns.  Oh, it says and

21    financial report.  Excuse me, he did get it right.  Yes, he

22    did.  Of course he did.  So, we don't know though, in that

23    case, whether those documents were audited or not.

24            MR. BROMBERG:  Actually, it was my case, Your Honor.

25            THE COURT:  That's right.  It was.  I remember that.

```
 1           MR. BROMBERG:  It was Arrow Financial.

 2           THE COURT:  Remember I said I saw that?  It's the

 3    same guy.  He's all over the place.

 4           MR. BROMBERG:  It's the Arrow case.  It was

 5    Magistrate Levy, Eastern District.  It was a pretty major-

 6    sized firm.  I can't remember whether the financials were

 7    audited or not.  It was Arrow Financial which is one of the

 8    largest debt collectors in the country, which has since been

 9    acquired by Sallie Mae or Fanny Mae, Sallie Mae, right and now

10    they're worth even more.

11           THE COURT:  Yeah.  We've got to move on.  Here is my

12    ruling for the day:  We are going to abide by Judge

13    Schroeder's ruling.  We are going to grant the -- I'm going to

14    call it the net worth discovered request.  We are going to

15    grant the requests, including the associated document requests

16    by directing the defendant C&S, not Midland, C&S, to provide

17    audited financial statements for the relevant years for the

18    relevant period.  Are you sure about this now, Mr. -- for

19    purposes of discovery, Mr. Bromberg, one year only?

20           MR. BROMBERG:  Well, the problem is that the case law

21    is not clear on whether you determine the net worth as --

22           THE COURT:  Will I be clearly erroneous if I required

23    them to provide for a year prior to the relevant year and a

24    year subsequent thereto, which would conclude 2013?

25           MR. BROMBERG:  That's fine.
```

```
 1          MR. SAYLES:  The cost in that could be upwards of 150
 2   to $200,000 if you're including three years.
 3          THE COURT:  Well, you don't know that.
 4          MR. SAYLES:  Well, we don't know that at all at this
 5   point.
 6          THE COURT:  And it might be substantially less.  I
 7   mean, the way -- I'm not pointing the finger at anybody,
 8   Mr. Sayles, but in a way, the Court's being asked to try to
 9   nail jelly to the wall and it's just not fair and I've got to
10   put some burden on the defendant here because in effect you're
11   saying, you know, look, you know, take it or leave it, you
12   know?  Whatever we give you, that's it.  You're not entitled
13   to --
14          MR. SAYLES:  I'm not saying that.
15          THE COURT:  I'm not telling -- I'm not permitting
16   them to do the auditing that you're resisting.  I'm giving you
17   the chance to do your own auditing by directing that you
18   provide audited financial statements and tax returns,
19   corporate partnership tax returns for the -- what is the year
20   before again?  I've got to get this right.
21          MR. BROMBERG:  2011 to 2012, Your Honor is the range
22   of the class that's been served.
23          THE COURT:  And the -- for purposes of discovery,
24   2010 to 2011 on the back side and on the front side, 2012 to
25   2013.  I'm assuming their fiscal year is the calendar year.
```

1     MR. SAYLES:  Your Honor, if that's the order, is

2  there a possibility --

3     THE COURT:  Just a second.  Let me finish.  So, we're

4  going to order audited financials for those calendar years

5  2010 to 2011, 2011-2012, 2012-2013 and we're going to require

6  those to be financial -- excuse me, balance sheets, income

7  statements, profit and loss statements, cash flow statements

8  and current trial balance for the defendant's current fiscal

9  year.  That would be the first quarter of 2014.

10     MR. SAYLES:  If I may, Your Honor, is there an out --

11  given that ruling or that instruction, is there an option that

12  would give Cohen and Slamowitz the option to produce the

13  documents to plaintiff in lieu of its incurring that

14  expensive --

15     THE COURT:  The requested documents?

16     MR. SAYLES:  Because I don't want to speak -- I don't

17  know.  It's a substantial sum that's been imposed on them.

18     THE COURT:  Well, I mean --

19     MR. SAYLES:  And Your Honor, I don't --

20     THE COURT:  You know what my reaction to that is,

21  Mr. Sayles?  In your -- you've been practicing long enough and

22  I'm sure Mr. Leghorn and the other lawyers are, this

23  information is probably the information that a competent, in-

24  house accountant or outside accountant would have at his or

25  her fingertips if they were charged with the responsibility of

1   preparing a competently-prepared balance sheet only.

2          MR. SAYLES:  This doesn't have to be audited by an

3   independent third party?

4          THE COURT:  You figure it out.  I'm using the word

5   audited as commonly referred to and if there's a way to do it

6   in and a way that's satisfactory to the plaintiff, you work it

7   out with them and that's it.  If there's an alternative you

8   want to explore --

9          MR. SAYLES:  That's as to the Cohen and Slamowitz LLP

10  only, correct?

11         THE COURT:  Yes.  Okay?  Did you get that, Sandra?

12  That's it.  That disposes of a number of requests,

13  Mr. Bromberg?

14         MR. BROMBERG:  Yes, many.

15         MR. SAYLES:  Your Honor, was there a timeframe set on

16  that?

17         THE COURT:  Not yet.  Timeframe -- I want to get the

18  numbers down here for the record.

19         MR. BROMBERG:  That covers Request for Production 19

20  through 49 with the exception of 24 and 25.

21         THE CLERK:  What were those, 19 through?

22         MR. BROMBERG:  19 through 49, but not 24 and 25.

23         THE COURT:  And interrogatories?

24         MR. BROMBERG:  Interrogatories, no.

25         THE COURT:  Well, yes, 19 to 24 interrogatories.

1          MR. BROMBERG:  Oh, excuse me.  Sorry, 19 to 24.  I'm

2     sorry, Your Honor, you're right.

3          THE COURT:  Thank you.  All right.  Anybody need a

4     break?

5          MR. SAYLES:  And just if I may, I believe --

6          THE COURT:  Oh, the timeframe.  Ninety days,

7     Mr. Bromberg?

8          MR. BROMBERG:  That's fine, Your Honor.

9          THE COURT:  Ninety days, Mr. Sayles?

10         MR. SAYLES:  I don't want to speak out of turn.  I

11    don't know what timeframe the accountant would require.  I

12    imagine at least the month of April through the next two weeks

13    is shot for the accountant, but 90 days would be time to at

14    least inquire and urge that.  Although, Judge, I believe the

15    requests that were presented here were documents that they

16    relied upon in forming their net worth value that they

17    reflected.

18         I mean, now we've got three years.  Cohen and

19    Slamowitz have got audited financials for three years,

20    including a year that's not even within the class that's been

21    certified here.

22         THE COURT:  Why am I saying that?  Because I'm

23    looking at it from a discovery point of view which is to test

24    the -- well, you know, Mr. Bromberg, now that I think about

25    it, maybe that's more than you really need, now that I think

 1   about it on reflection.  If they're audited, why wouldn't that

 2   one year be good enough?

 3            MR. BROMBERG:  Well, the only issue really becomes

 4   that --

 5            THE COURT:  I know I'm asking you a difficult

 6   question despite your vast experience in this, but we're

 7   dealing in uncharted waters here.

 8            MR. BROMBERG:  Okay.  The problem is, it's not clear

 9   from the case law what point you measure the net worth for

10   purposes of the cap; whether it's the date of the violations

11   or the date that the case actually goes to trial.

12            THE COURT:  I was thinking more a matter of the trier

13   of fact trying to figure out what the right number is and it

14   could be that an expert accountant would say, Judge, you

15   really need a time frame within which to make a judgment based

16   on an opinion that somebody would give after looking at these

17   things.

18            An opinion might be that it was just the one year,

19   that's good enough, but an opinion from a forensic accountant

20   might be, you know, we needed to have the year prior and the

21   year following in order to advise the trier of fact what the

22   correct number really is.  I mean, the fact that they claim it

23   to be done with -- under general accounting principals, would

24   that prevent you from challenging that?  I don't think so.

25   It's going to be the trier of the fact will decide.  So, just

1    as we do in other discovery context, typically we ask for some

2    timeframe in order to help us achieve some reasonable accuracy

3    as to what the underlying fact really is.  So, that's why I am

4    tempted to -- intending to do what I've just already said I

5    think we should do.

6            MR. BROMBERG:  No, I think that makes sense.  I think

7    that's -- I hadn't thought of it that way.  I was thinking

8    more of a legal question of when you fixed that.

9            THE COURT:  Well, it's a discovery dispute.  I'm not

10   attempting to fix liability here.

11           MR. BROMBERG:  No, I think that makes sense that you

12   need one year before and one year after to make sure that what

13   you're seeing --

14           THE COURT:  Whatever the number is for the relevant

15   period is the correct number.

16           MR. BROMBERG:  Right.

17           THE COURT:  That's my thinking, Mr. Sayles.  If you

18   want to come up with something else by some agreement with

19   Mr. Bromberg after the proceeding is over with, you go right

20   ahead.

21           MR. SAYLES:  Well, no more in any of the other cases

22   on this point have I seen any discussion of looking at years

23   in a bracket.  It was net worth for financial records for the

24   given year.  I just -- it's been explained unduly and I think

25   it's overly prejudicial and burdensome to my client.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MICHAEL HALLMARK, on behalf of
himself and all others similarly situated,

                    Plaintiff,

           vs.                             Civil Action No.
                                           No. 11-CV-842(WMS)(LGF)

COHEN & SLAMOWITZ, LLP              CLASS ACTION
MIDLAND FUNDING LLC d/b/a
MIDLAND FUNDING OF DELAWARE LLC,

                    Defendants.

_____

### Certificate of Service

I, Brian L. Bromberg, an attorney, hereby certify that on May 12, 2014, the

foregoing documents were filed with the Clerk of the Court and served in

accordance with the Federal Rules of Civil Procedure, and/or the Western District's

Local Rules, and/or the Western District's Rules on Electronic Service upon the

following parties and participants:

Kenneth R. Hiller       Seth Andrews       Jonathan R. Miller

Andrew C. Sayles      Steven A. Kroll

Thomas A. Leghorn    Joseph L. Francouer

Dated: New York, New York
      May 12, 2014

                         /s/ Brian L. Bromberg
                           Brian L. Bromberg

MICHAEL HALLMARK, on behalf of himself and all others similarly situated, Plaintiff,
v.
COHEN & SLAMOWITZ, MIDLAND FUNDING LLC, Defendants.
11-CV-842S(F)
UNITED STATES DISTRICT COURT WESTERN DISTRICT OF NEW YORK
October 8, 2014

**DECISION and ORDER**

APPEARANCES:

BROMBERG LAW OFFICE, PC.
Attorneys for Plaintiff
BRIAN L. BROMBERG,
JONATHAN R. MILLER, of Counsel
40 Exchange Place, Suite 2010
New York, New York 10005

LAW OFFICES OF KENNETH HILLER, PPLC
Attorneys for Plaintiff
SETH ANDREWS, of Counsel
6000 North Bailey Avenue, Suite 1A
Amherst, New York 14226

CONNELL FOLEY LLP
Attorneys for Defendant Cohen & Slamowitz, LLP
ANDREW C. SAYLES, of Counsel
85 Livingston Avenue
Roseland, New Jersey 09068

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
Attorneys for Defendant Midland Funding, LLC
THOMAS A. LEGHORN, of Counsel
150 East 42nd Street
New York, New York 10017

**JURISDICTION**

This action was referred to the undersigned by Hon. William M. Skretny on November 10, 2011 for all non-dispositive pretrial matters (Doc. No. 9). It is presently

Page 2

before the court on Defendant Cohen & Slamowitz, LLP's motion for reconsideration and a protective order, filed April 30, 2014 (Doc. No. 190) ("Defendant's motion").

**BACKGROUND and FACTS[1]**

This class action asserting Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), was initiated on July 2, 2012 by the filing of Plaintiff's Amended Complaint (Doc. No. 28). Specifically, Plaintiff alleges C&S violated FDCPA Section 1692e(2)(A) by demanding, in a letter to Plaintiff, payment of a $140 court filing fee in connection with Buffalo City



Court collection actions instituted against Plaintiff without actually having paid such filing fee at the time C&S's demand letter was sent, between March 2011 and March 2012, to approximately 38,000 debtors residing in New York State, for payment of the debt and such filing fees. Plaintiff also alleges Defendants violated FDCPA Sections 1692e, 1692e(2)(A), e(5), e(10), (f) and (f)(1) by making deceptive and misleading demands. Plaintiff's class action was certified by Chief District Judge Skretny on September 16, 2013 (Doc. No. 110). By order dated January 8, 2014, Judge Skretny denied Defendants' motion to decertify the class (Doc. No. 177).

On April 12, 2013, Plaintiff moved to compel responses to Plaintiff's First Set of Interrogatories, Document Requests and Requests to Admit (Doc. Nos. 71) ("Plaintiff's motion to compel"). Plaintiff's discovery requests[2] were directed to C&S's net worth specifically requesting C&S financial information such as: (1) C&S's real property

Page 3

ownership (Int. No. 19), (2) financial assets including bank deposits, investment accounts, retirement accounts, securities, vehicles, furnishings, fixtures, equipment, computers and accounts receivable (Int. No. 20), (3) debt whether individually or jointly owned with co-Defendant Midland (Int. No. 22), (4) C&S's tax returns and related schedules for 2007 through 2013 (Doc. Request No. 20), (5) accounting statements regarding C&S's assets and liabilities for 2007 to 2013 (Doc. Request No. 21), (6) applications for credit and related financial statements (Doc. Request No. 22), (7) asset and financial statements provided to investors, creditors, auditors, accountants, and agencies (Doc. Request No. 23), (8) any litigation documents reflecting C&S's net worth (Doc. Request No. 26), (9) all relevant corporate documents such as shareholder and buy-sell agreements (Doc. Request No. 28), (10) documents describing C&S's accounts receivables and payables, budget forecasts and hourly rates (Doc. Request Nos. 30-31), (11) annual financial statements and tax returns for each segment of C&S's business (Doc. Request No. 34), (12) discretionary expenses (Doc. Request No. 35), (13) the fair market value of any intangible assets (Doc. Request No. 36), work in process, inventory, and any off-the-books assets or liabilities (Doc. Request Nos. 37-40), (14) compensation and employee benefit plans, balance sheets, loan applications, income and profit and loss statements for the past three years, bank statements and mortgage, pledge or security agreements (Doc. Request Nos. 41-42, 45-49) and (15) C&S's transfer of any identified assets, the circumstances regarding such transfer and any consideration received (Int. No. 24). Defendant's response included the general objection that Plaintiff's requests were (1) premature given that at the time no class had then been certified and (2) irrelevant as C&S's net worth was less than $1,000 because

Page 4

C&S had no retained earnings or real property (C&S Answer to Plaintiff's Int. No. 30, Doc. No. 73-1 at 17). Plaintiff asserts Plaintiff is entitled to discovery of such requested information because in an FDCPA class action plaintiffs' recovery is limited by 15 U.S.C. § 1692(a)(2)(B) to the lesser of $500,000 or 1% of a defendant's net worth and Plaintiff must be prepared to challenge Defendant's assertion of "low net worth." Plaintiff's Memorandum of Law, Doc. No. 72, at 3 and n. 4 (citing cases).

Defendants' motion is supported by Defendant Cohen & Slamowitz, LLP's Memorandum Of Law In Support Of Motion For Reconsideration Or For A Protective Order (Doc. No. 190-1) ("C&S's Memorandum of Law"), Affidavit Of Gregory Giugliano, CPA (Doc. No. 190-2) ("Giugliano Affidavit") and Declaration Of Andrew C. Sayles, Esq. In Support Of Motion For Reconsideration And For Protective Order (Doc. No. 190-3) ("Sayles Declaration I"). In further support of Defendant's motion, on May 9, 2014, C&S submitted, for filing under seal, the Declaration Of Andrew C. Sayles, Esq.,



submitting financial information consisting of C&S's financial statement for 2011-2012 ("Sayles Declaration II") in further support of Defendant's motion, attaching Exhibits A - D ("Sayles Declaration II Exh(s). ___") ("Defendant's Sealing Request"). By order of the court, on July 23, 2014 (Doc. No. 217), this document was filed under seal (Doc. No. 218).

On May 27, 2014, Plaintiff filed, in redacted form, Plaintiff's Memorandum of Law in Opposition to Defendant Cohen & Slamowitz, LLP's Motion for Reconsideration or, in the Alternative, for a Protective Order (Doc. No. 201) ("Plaintiff's Memorandum") (Plaintiffs also submitted to the court an unredacted form of Plaintiff's Memorandum) along with the Declaration of Plaintiff's Attorney Brian L. Bromberg in Opposition to

Page 5

Cohen & Slamowitz, LLP's Motion for Reconsideration or, in the Alternative, for a Protective Order (Doc. No. 202) ("Bromberg Declaration I") together with exhibits A - C (Doc. No. 202-1-3 ("Bromberg Declaration I Exh(s). ___"). By papers, also filed May 27, 2014, Plaintiffs moved to file under seal the unredacted version of Plaintiff's Memorandum and Bromberg Declaration Exhs. B & C (Doc. No. 203) ("Plaintiff's Motion to Seal"). Plaintiff's Motion to Seal requests that the aforereferenced Bromberg Declaration Exhibits B & C be filed under seal because C&S has submitted such documents, marked Confidential, to the court in support of Defendant's motion and such designation requires that documents be filed under seal when submitted to the court in accordance with the Stipulation of Confidentiality ¶ 10 (Doc. No. 193) and Plaintiff's opposition to Defendant's motion requires reference to such documents. Plaintiff's Motion to Seal at 2. Plaintiff's motion was granted on July 23, 2013 (Doc. No. 219). An unredacted form of the Bromberg Declaration and Bromberg Declaration Exhs. A - C) filed July 23, 2014 (Doc. No. 221) was submitted by Plaintiff.

On June 2, 2014, Defendant C&S filed a Reply Memorandum Of Law In Further Support Of Defendant Cohen & Slamowitz, LLP's Motion For Reconsideration Or For A Protective Order (Doc. No. 207) ("Defendant's Reply Memorandum").

On July 23, 2014, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendant Cohen & Slamowitz, LLP's Motion for Reconsideration or, in the Alternative, for a Protective Order (Doc. No. 220) ("Plaintiff's Memorandum"), along with the Declaration of Plaintiff's Attorney Brian L. Bromberg in Opposition to Cohen & Slamowitz, LLP's Motion for Reconsideration or, In the Alternative for a Protective Order (Doc. No. 221) ("Bromberg Declaration II") attaching Exhibits A - C (Bromberg

Page 6

Declaration II Exhs. A-C"). On August 6, 2014, Plaintiff filed Plaintiff's Supplemental Memorandum of Law in Opposition to Defendant Cohen & Slamowitz, LLP's Motion for Reconsideration or, In the Alternative, for a Protective Order (Doc. No. 224) ("Plaintiff's Supplemental Memorandum").

On August 18, 2014, Defendant C&S filed Defendant Cohen & Slamowitz, LLP's Supplemental Response In Further Support Of Its Motion For Reconsideration Or For A Protective Order (Doc. No. 226) ("Defendant's Supplemental Response") together with the Supplemental Declaration Of Andrew C. Sayles, Esq., In Further Support Of Motion For Reconsideration And Protective Order (Doc. No. 226-1) ("Sayles Supplemental Declaration") attaching exhibits A&B ("Sayles Supplemental Declaration Exhs. A&B").



On October 1, 2014, Defendant filed a Notice of Supplemental Authority, (Doc. No. 229) ("Supplemental Authority"), attaching a copy of a recent Decision and Order in *Godson v. Eltman, Eltman & Cooper, P.C., et al.*, 11-CV-764S(Sr) (Doc. No. 229-1) ("*Godson* September 15, 2014 D&O").

**DISCUSSION**

Defendant Cohen & Slamowitz, LLC ("C&S" or "Defendant") moves for reconsideration of the court's decision, following oral argument conducted April 2, 2014 (Doc. No. 184), on Plaintiff's motion, filed April 12, 2013, to compel information relating to Defendant's net worth (Doc. No. 71). At that hearing, the court, without specifically ruling on Plaintiff's motion to compel, directed, based on a recent decision by another magistrate judge of this court, Hon. H. Kenneth Schroeder, involving a similar discovery dispute, *Godson v. Eltman, Eltman & Cooper, P.C.*, 2013 WL 4832715 (W.D.N.Y. Sept.

Page 7

11, 2013) ("*Godson*"), that Defendant should, in satisfaction of Plaintiff's discovery requests, produce audited financial statements and copies of Defendant's tax returns for Defendant's 2011, 2012 and 2013 tax years, Declaration of Brian L. Bromberg, Doc. No. 221, Exh. A (transcript of oral argument conducted April 2, 2014) at 78-79 ("the April 2, 2014 ruling"). Defendant argues that in directing Defendant produce audited financial statements, instead of the underlying financial information which Defendant's balance sheets were based, in response to Plaintiff's discovery requests, the court misread *Godson*. Specifically, according to Defendant, *Godson* did not hold that a FDCPA class action defendant, like C&S, is required to produce audited financials on the issue of damages which is capped by statute at the lesser of $500,000 or 1 % of a defendant's net worth by the FDCPA, *see* 15 U.S.C. § 1692k(a)(2)(B) ("§1692K(a)(2)(B)"). C&S's contention is predicated on its assertion that, because the defendant in *Godson* had provided audited financials the court would not have required defendant to produce audited financials had not the audited financials been created by defendant and available for production, and, as such, the court's direction to defendant to produce its audited financial was merely "incidental" to Judge Schroeder's primary determination that plaintiff was not entitled to defendant's financial records, other than defendant's previously prepared audited financials and its tax returns. Defendant's Memorandum (Doc. No. 190-1) at 10. *See Godson*, 2013 WL 4832715, at *3. Defendant also claims Judge Schroeder cited no authority "for requiring production of audited financial records," in cases like this one, Defendant's Memorandum at 10. Defendant further argues that this court erred in requiring audited financials for Defendant's fiscal years ending 2011, 2012 and 2013, referencing the transcript of the oral argument, Bromberg

Page 8

Declaration, Exh. A, at 80, where the court stated that audited financial information for the Defendant's fiscal years prior to and following 2012, during which the alleged FDCPA violations occurred, would be relevant to an accurate factual determination of C&S's net worth at trial, with the probable aid of expert testimony, of Defendant's net worth for 2012. *Id.* at 83-84.

**1. Defendant's Motion for Reconsideration.**

The standard for granting a motion for reconsideration under Fed.R.Civ.P. 60(b) is strict. *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or important facts that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id.* Nor is a motion for reconsideration intended to be a "second bite at the apple" for a party dissatisfied with the court's ruling by "relitigating old issues, presenting the case under new theories,



[or] securing a rehearing on the merits . . .." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Generally, reconsideration is justified only where there exists "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 C. Wright, A Miller & E. Cooper, FEDERAL PRACTICE & PROCEDURE § 4478 at 790).

Here, Defendant seeks reconsideration of the court's decision, following oral argument on April 2, 2014, directing Defendant produce audited financial statements, particularly C&S's balance sheet for its 2011, 2012 and 2013 fiscal years. In reaching

Page 9

its determination, the court was guided by *Godson v. Eltman, Eltman & Cooper, P.C.*, 2013 WL 4832715 (W.D.N.Y. Sept. 11, 2013) ("*Godson*"), a recent decision on a similar discovery dispute in which the court directed defendants to produce their audited financials. However, upon further review, it appears that in *Godson* such audited financials had been previously prepared for defendants by defendants' outside accountants, and thus it was not the case that the court had directed production of audited financials that did not previously exist in response to plaintiff's discovery requests. More specifically, in a recent ruling, dated September 15, 2014, in the *Godson* litigation, the court directed production by co-defendant LVNV of "its audited financial statements," *Godson* September 15, 2014 D&O, Doc. No. 229-1, at 9 (underlining added), from which it is inferable that such audited financials already existed.[3]

It is basic that in responding to a document production request, pursuant to Fed.R.Civ.P. 34(a) ("Rule 34(a)"), "a party is not required to create documents meeting the document requests, only to produce documents already in existence." Baicker-McKee Janssen Corr, FEDERAL CIVIL RULES HANDBOOK, Thompson Reuters (2014) at 889) citing caselaw. *See also Breedlove v. Mandell*, 2008 WL 596864, at *2 (W.D.N.Y. Feb. 29, 2008) (denying motion to compel based on requested party's representation that it had no record of requested document, and in the absence of any reason to doubt such representation, because the "[c]ourt cannot compel production of what does not exist." (quoting *American Banana Co., Inc. v. Republic National Bank of New York, N.A.*, 2000 WL 521341, at *3 (S.D.N.Y. May 1, 2000))). Thus, in the instant case, while

Page 10

this court sought to dispose of Plaintiff's motion to compel consistent with *Godson*, by directing C&S to produce audited financials which do not presently exist, to do so would be contrary to the general rule that defendants are only required to produce previously prepared audited financials. Therefore, the court's recent rulings in *Godson* provide clarification of the prior *Godson* decision regarding discovery of defendant's financial documents, consistent with this general rule. Although production by C&S of audited financials, the 'gold standard' of accounting practice, could, if accepted by Plaintiff in lieu of Plaintiff's discovery requests, obviate the need for discovery of the C&S's underlying financial records relevant to C&S's net worth which remain the subject of Plaintiff's motion to compel, nevertheless, as discussed, *supra*, the court is required to avoid directing discovery beyond that permitted by Rule 34(a).

The question remains, however, whether Plaintiff's motion to compel, left unresolved by the court's April 2, 2014 ruling, seeking such underlying information should be granted in light of C&S's proffer of its financial statements that have been reviewed, but not audited, by C&S's outside accountant. *See* Sayles Declaration Exhs. A-D (Independent Accountant Review Report for C&S's Unconsolidated and Consolidated Financial Statements for Fiscal Years ending December 31, 2011 and 2012, respectively) ("Reviewed Statements"). While such Reviewed Statements are certainly helpful in providing a definitive answer to the question of C&S's net worth, they are not dispositive, and, for that matter, neither would



audited statements. Significantly, Defendant cites to no authority holding that the production of such Reviewed Statements forecloses further discovery on the issue of a defendant's net worth and the court's research reveals none. On the other hand, to illustrate the need for further fact

Page 11

discovery in this case directed to whether the Reviewed Statements accurately describe C&S's net worth, Plaintiff questions whether C&S has fairly stated the value of its Portfolio Investments, the underlying defaulted debt instruments acquired by C&S as a major asset of its collections business which C&S attempts to collect thereby producing significant revenue to C&S, which C&S stated at cost on the Reviewed Statements, as a significant C&S asset, or whether the value of these assets are substantially understated by C&S. *See* Plaintiff's Memorandum at 17. Additionally, in FDCPA class action cases seeking damages pursuant to § 1692K(a)(2)(B) courts permit discovery of a defendant's underlying financial data relevant to the issue of defendant's net worth. *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.*, 256 F.R.D. 661, 669 (D.N.M. 2009) (court "will ultimately determine how to calculate net worth and whether any documents produced in response to [plaintiff's] request are admissible"); *Miller v. Abrams, Fensterman, et al.*, 2011 WL 6105033, at *1 ("'Plaintiff need not accept defendant's interpretation of its financial data . . . but is entitled . . . to examine the data underlying defendant's statement of net worth.'" (quoting *Mailloux v. Arrow Financial Services, L.L.C.*, 2002 WL 246771, at *1 (E.D.N.Y. Feb. 21, 2002))). In *Miller*, the court permitted deposition questions directed to certain deductions on defendant's tax returns challenged by plaintiff as improperly understating defendant's net worth. *Miller*, 2011 WL 6105033, at *1. In *Mailloux*, the court enforced plaintiff's discovery requests "related to defendant's net worth." *Mailloux*, 2002 WL 246771, at *1. Thus, production of the &S's Reviewed Statements, although relevant to the question of C&S's net worth, does not foreclose Plaintiff's discovery of C&S's financial information upon which such Reviewed Statements were based. Accordingly, Defendant's motion for reconsideration

Page 12

should be GRANTED and, *sua sponte*, the court finds Plaintiff's motion to compel, should also be GRANTED.

## 2. Defendant's Motion for a Protective Order.

Defendant's motion for a protective order is predicated on Defendant's contention that the cost of producing audited financials is disproportionate to the value of the issue of Plaintiff's damages. Defendant's Memorandum at 10. Specifically, Defendants argue that, based on Defendant's Reviewed Statements, the costs of producing audited financials for Defendant's 2010, 2011, and 2012 fiscal years would be in the range of $100,000 to $150,000, see Giugliano Affidavit ¶ 6, vastly exceeding Plaintiff's potential recovery which Defendant asserts would be substantially less. Defendant's Memorandum at 14. However, as the court, upon reconsideration, will vacate its April 2, 2014 ruling directing Defendant to provide audited financials responsive to Plaintiff's motion to compel, the court finds Defendant's alternative motion for a protective order is moot and, as such, is DISMISSED.

## CONCLUSION

Based on the foregoing, Defendant's motion for reconsideration (Doc. No. 190) is GRANTED; the court's order that C&S produce audited financials for three fiscal years (Doc. No. 184) is VACATED; Defendant's motion for a protective order is DISMISSED as moot; Plaintiff's motion to compel (Doc. No. 71) is GRANTED.



Page 13

SO ORDERED.

_/s/ Leslie G. Foschio_
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated:October 8, 2014
     Buffalo, New York


--------

Footnotes:

[1] Taken from the papers and pleadings filed in this action.

[2] Each of Plaintiff's discovery requests is referenced in Defendant C&S's responses to Plaintiff's discovery requests, filed as Doc. No. 73-1.

[3] Although there is no explicit statement denying the existence of audited financials for C&S, taken as a whole, the record indicates this to be the fact.


--------

fastcase