UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

WAI HOE LIEW a/k/a MICHAEL W. LIEW,
KHURRAM KAYANI, and
ELIZABETH K. ATWOOD a/k/a ELIZABETH
KING

                    Plaintiffs,

                                              <u>MEMORANDUM AND ORDER</u>

     -against-

COHEN & SLAMOWITZ, LLP,                        14-CV-4868 (KAM)(MDG)
MITCHELL SELIP, MITCHELL G. SLAMOWITZ,
and DAVID A. COHEN

                    Defendants.

--------------------------------------X
**MATSUMOTO, United States District Judge:**

          On August 15, 2014, Wai Hoe Liew a/k/a Michael W.

Liew ("Mr. Liew"), Khurram Kayani ("Mr. Kayani") and Elizabeth

Atwood a/k/a Elizabeth King ("Ms. Atwood") (collectively,

"plaintiffs") filed a complaint against Cohen & Slamowitz, LLP

("C&S"), and attorneys of that firm Mitchell Selip ("Mr.

Selip"), Mitchell G. Slamowitz ("Mr. Slamowitz") and David A.

Cohen ("Mr. Cohen") (collectively, "defendants"), alleging

violations under the Fair Debt Collection Practices Act

("FDCPA") and New York state law. (Compl., ECF No. 1, filed

8/15/14.) On December 8, 2014, defendants moved to disqualify

plaintiffs' counsel Mitchell Pashkin ("Mr. Pashkin") based on

Mr. Pashkin's prior involvement as an attorney employed at, and

assisting in the defense of, C&S in *Coble, et al. v. Cohen &*

*Slamowitz, LLP, et al.*, 11-cv-1037[1] (S.D.N.Y.) (the "*Coble*

litigation" or "*Coble*").  For the reasons stated herein,

defendants' motion to disqualify Mr. Pashkin is granted.

## I. Background[2]

Mr. Pashkin was employed as an attorney by C&S from

approximately June 2011 to January 2014.  (Aff. of Mitchell L.

Pashkin ("Pashkin Aff.") ¶ 18, ECF No. 20-2, filed 12/22/14;

Hr'g Tr. at 54:18-19[3]; *see also* Francoeur Aff., Ex. C (Pashkin

resume), at 2, ECF No. 19-3.)  Mr. Pashkin started as an

assistant managing attorney and was promoted to managing

attorney of C&S in the late spring of 2013 after the then-

managing attorney, Leandre John, was terminated.  (Pashkin Aff.

¶ 3.)  Prior to the termination of Mr. John, Mr. Pashkin was

not involved in defending C&S in any FDCPA actions.  (*Id.*)

A. **The *Coble* Litigation**

In February 2011, plaintiffs Elizabeth Coble and

others filed a class action suit against C&S, Mr. Cohen, Mr.

Slamowitz and other employees of C&S in the United States

District Court for the Southern District of New York.  (Compl.

---

[1] In the Revised Affirmation of Thomas A. Leghorn (ECF No. 22, filed
1/7/15), Mr. Leghorn affirmed that the *Coble* litigation corresponded to the
docket number 10-cv-3920.  Plaintiffs' complaint listed the *Coble* docket
number as 11-cv-1037.  (Compl. ¶ 37.)  Based on the court's review of the
public docket, the correct docket number appears to be 11-cv-1037.
[2] The following facts, taken from the parties' affirmations and exhibits
attached thereto, are undisputed unless otherwise noted.
[3] Mr. Pashkin and Mr. Leghorn testified at a hearing before the court on
January 30, 2015.

¶ 26.[4]) Mr. Leghorn, a member of the law firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP, was the primary attorney of record defending C&S and its attorneys in the *Coble* case. (Revised Leghorn Aff. ¶¶ 1, 3.) Mr. Leghorn worked with C&S attorney Mr. John on defending the *Coble* case until Mr. John was terminated in the spring of 2013, after which Mr. Leghorn began working with Mr. Pashkin. (Pashkin Aff. ¶¶ 3, 18; Hr'g Tr. at 28:18-28:21.)

The *Coble* plaintiffs alleged that C&S continued to enforce state court judgments it had obtained against plaintiffs even after C&S became aware as of 2006 that its process server, Midlantic Process, Inc. ("Midlantic"), was falsifying affidavits of service. (Compl. ¶ 27.) Midlantic engaged in so-called "sewer service" that included making no attempts at personal service before serving process by the "nail & mail" method, making false references to neighbors, and forgery and false notarization of the process server's signature. (*Id.*)

The *Coble* court denied the C&S defendants' motion to dismiss and found that the *Coble* plaintiffs sufficiently alleged that the defendants were on notice that any default judgments based on the Midlantic affidavits were potentially

---

[4] Plaintiffs' Complaint in the instant case is also attached to the Affirmation of Joseph L. Francoeur ("Francoeur Aff.") as Exhibit A, ECF No. 19-1, filed 12/8/14.

fraudulent as of 2006.  (*Id.* ¶ 28.)  The *Coble* court also found

that the plaintiffs plausibly alleged that the *Coble*

defendants, including C&S, failed to investigate Midlantic's

fraudulent practices in violation of the FDCPA and concealed

the violation.  (*Id.*)  The parties in *Coble* finalized the

settlement agreement pursuant to a court-approved agreement

after Mr. Pashkin was terminated from C&S.  (*Id.* ¶ 31; Pashkin

Aff. ¶ 11.)

        The *Coble* settlement class consisted of all persons

who had been sued in consumer collection actions in New York

State since December 30, 2002 where C&S represented the state

court plaintiff (a debt collector) and the affidavit of service

was signed and/or notarized by Midlantic.  (*Id.* ¶ 31.)  The

settlement class also consisted of a subclass of all class

members who made involuntary payments after October 30, 2006

following a judgment entered in a consumer collection action

commenced in New York State where C&S represented the state

court plaintiff and the affidavit of service was signed and/or

notarized by Midlantic.  (*Id.*)

**B. Mr. Pashkin's Involvement in the *Coble* Litigation**

        After Mr. Pashkin became the Managing Attorney at

C&S in the spring of 2013, he defended C&S on two or three

FDCPA cases, which Mr. Pashkin described as "small and fairly

frivolous" cases.  (Pashkin Aff. ¶ 18(k).)  In his affirmation

submitted under penalty of perjury, Mr. Pashkin references his curriculum vitae (CV) which sets forth "[t]he nature and scope of [his] responsibilities as an employee" at C&S. (Pashkin Aff. ¶ 19.) Mr. Pashkin describes his FDCPA defense experience on his CV as follows:

- Acted as liaison between firm and insurance company defense attorneys regarding strength of case, substantive defense options, litigation strategy, and case status. Reviewed, revised as needed, and approved all submissions to court or communications to opposing counsel by insurance company defense attorneys in defense of federal class actions and non-self defended federal district court actions regarding alleged violations of the FDCPA.
- Gathered information and documents for Rule 26 disclosures and worked with IT department to compile and gather electronic information for discovery responses and to ascertain scope of potential liability.
- Liaison between employer and clients regarding risks to them resulting from lawsuits against firm and steps being taken by firm to correct problems which resulted in lawsuits.
- Made recommendations to Senior Management of law firm based on issues exposed by lawsuits against firm, potential risks related to the practices of its clients, and operational deficiencies.

(*Id.* ¶ 20 ("The only bullet points on my CV which relate to the FDCPA are as follows:"); *see also* Francoeur Aff., Ex. C (Pashkin resume), at 3.) Mr. Pashkin affirmed that the first bullet point regarding acting as a liaison between

firm and insurance company defense attorneys was related to the *Coble* litigation or Mr. Leghorn. (Pashkin Aff. ¶ 21.)

According to Mr. Leghorn, the *Coble* litigation commenced with a mediation that lasted over a year and later became a settlement. (Hr'g Tr. at 29:17-29:24.) During the period of time from when Mr. John participated in the *Coble* litigation to when Mr. Pashkin assumed Mr. John's role as managing attorney, settlement negotiations were underway and the two key issues that required further negotiation and modification were class size and net worth of C&S. (Hr'g Tr. at 29:25-30:7.)

The parties do not dispute that Mr. Pashkin was involved in aspects of the *Coble* litigation that related to the settlement agreement and class lists. *See supra*. In addition, defendants assert that Mr. Pashkin was involved in substantive discussions about the net worth of C&S and participated in the mediation of the *Coble* matter before Judge Crane, which Mr. Pashkin denies. The court will summarize the undisputed and disputed facts pertaining to Mr. Pashkin's involvement or lack thereof in each aspect of the *Coble* litigation and the court's credibility determinations based on the testimony of Messrs. Leghorn and Pashkin at the January 30, 2015 hearing and oral argument.

1. <u>Settlement Agreement</u>

The parties do not dispute that Mr. Cohen asked
Mr. Pashkin to review the *Coble* draft settlement agreement
in order to assess the impact of the settlement terms on
C&S's responses to future debt collection actions.
(Pashkin Aff. ¶ 5; Hr'g Tr. at 40:13-42:6, 52:2-53:20).
Specifically, Mr. Pashkin was asked by Mr. Cohen to give
his opinion on how the terms of the draft settlement
agreement would affect state court actions where the
defendant consumer was seeking to vacate judgments or
dismiss cases where C&S was representing the debt-collector
plaintiff and Midlantic was the process server. (*Id.*) Mr.
Pashkin affirms that only "one or two small paragraphs []
had any bearing on this issue." (Pashkin Aff. ¶ 5; *see
also* Hr'g Tr. at 52:2-10 ("Mr. Cohen handed me the
settlement agreement and asked me just to look over two
particular paragraphs").)

Mr. Pashkin, Mr. Leghorn, Mr. Cohen and Mr. Selip
participated in at least one conference call discussion
about Mr. Pashkin's review of the *Coble* draft settlement
agreement. (Pashkin Aff. ¶ 5; Hr'g Tr. 42:1-42:6.) Mr.
Legorn credibly testified that he participated in at least
two in-person discussions with Mr. Pashkin, and
"conservative[ly]," at least a half dozen substantive phone

conversations regarding the *Coble* litigation with Mr.
Pashkin on the call, over the lengthy negotiation period.
(Hr'g Tr. 43:10-43:21.)  In addition, Mr. Leghorn had many
discussions with Mr. Pashkin over email about substantive
settlement issues involving confidential information
relating to C&S's net worth, maximum recoverable damages
and other confidential information.  (*Id.* 44:7-47:3.)
Further, Mr. Leghorn credibly testified that the
confidential discussions regarding "how high . . . the
settlement had come in relation to the maximum recoverable
damages" was solely disclosed to the attorneys and "could
be used to the detriment" of defendants in another
proceeding.  (*Id.* 46:1-46:21.)  He also credibly testified
that Mr. Pashkin was privy to privileged and confidential
discussions regarding litigation strategy and how to
structure the settlement agreement to protect C&S from
lawsuits such as the instant action.  These discussions of
litigation strategy and perceived exposures to the C&S firm
were discussed in conversations in which Mr. Pashkin was
present and over email.  (*Id.* 46:22-47:3.)  Mr. Pashkin
declined to cross examine Mr. Leghorn.  (*Id.* 47:17-47:19.)
Mr. Pashkin credibly testified that, in a conference call
with Mr. Leghorn and Mr. Cohen, he suggested "maybe a small
tweak" to the settlement agreement (Hr'g Tr. at 53:1-6),

and that he never communicated with Coble's counsel
regarding the suggested changes. (Pashkin Aff. ¶ 6.)

Mr. Pashkin also managed seven associate
litigation attorneys at C&S who were assigned to oppose the
various motions to vacate default judgments obtained by C&S
in state court. (Pashkin Aff. ¶ 8.) The associate
attorneys were directed to discuss with Mr. Pashkin any
motions where the process server was Midlantic. (*Id.*)
Based on Mr. Pashkin's knowledge of the *Coble* case and the
settlement agreement, he would discuss and decide with the
associate attorneys whether to oppose or consent to the
motions to vacate the default judgments. (*Id.*)

### 2. Class lists

Mr. Leghorn affirms that Mr. Pashkin participated
in conversations with defendants about whether the *Coble*
plaintiffs adequately disclosed the number of individuals
that would ultimately make up the class and subclass lists.
(Revised Leghorn Aff. ¶ 7.) Mr. Leghorn also affirms that
Mr. Pashkin participated in conversations regarding
"strategic issues related to the formation of a sub-class."
(*Id.* ¶ 6.) Mr. Leghorn credibly testified that he reviewed
emails between Mr. Pashkin, Mr. Cohen and himself where
they discussed how best to define the class period in order
to encompass as many potential class plaintiffs as

possible.  (Hr'g Tr. at 32:11-32:24) ("[W]e were originally

thinking of just having an open-ended back end [date]

whatever, but it was just unmanageable and I recall the

comment was that the date we were discussing, . . . that

anything before that, under any method of measuring the

time period would be long time barred.").

According to Mr. Leghorn, during the time Mr.

Pashkin took over as managing attorney at C&S and

participated in conference calls, "the settlement was

either going to bust apart or be modified, based on net

worth and . . . class size." (*Id.* at 31:2-31:9.)  Mr.

Pashkin was included in strategic discussions to analyze

C&S's exposure and define the broadest possible subclass to

"wrap up as much as possible" and "extinguish as many

claims . . . as possible." (*Id.* at 31:21-32:2.)  Mr.

Leghorn also testified that he and Mr. Pashkin exchanged

direct emails regarding Mr. Pashkin's principal involvement

in obtaining computer runs at C&S to determine how many

individuals fell within the class and the impact of the

class size on the settlement amount demanded.  (Hr'g Tr. at

37:12-37:25; 38:1-38:2.)

Mr. Pashkin affirmed that he was present at one

meeting with Mr. Selip and Mr. Edward Wilkinson ("Mr.

Wilkinson"), the manager of the C&S information technology

("IT") department, at which they discussed how to run a
search based on the scope of the class as set forth in the
settlement agreement draft. (Pashkin Aff. ¶ 10; Hr'g Tr.
at 63:6-63:10.) Other than this one conversation, Mr.
Pashkin affirms that his only involvement in compiling the
class lists was acting as a messenger between Mr. Cohen,
Mr. Leghorn, and Mr. Wilkinson, primarily to ensure that
Mr. Wilkinson was completing his tasks in a timely manner
and that the information Mr. Wilkinson provided was the
information that Mr. Leghorn needed. (Pashkin Aff. ¶ 10;
Hr'g Tr. at 62:19-24.) Mr. Pashkin affirms that this
information consisted of two different numbers representing
the two different classes and did not contain lists of
consumer names, index numbers, file numbers, etc. (Pashkin
Aff. ¶ 10.)

        The court does not credit Mr. Pashkin's
statements limiting his role in class size determinations
in the *Coble* litigation. Mr. Pashkin's CV describes his
legal experience far more extensively and is consistent
with Mr. Leghorn's detailed and credible hearing testimony.
The court fully credits Mr. Leghorn's detailed testimony
regarding Mr. Pashkin's significant involvement in
strategic, confidential discussions regarding the size of

11

the class and subclass and the settlement objectives of

reducing C&S's exposure to future litigation.

### 3. Net Worth of C&S

Mr. Leghorn affirms that Mr. Pashkin participated

in conversations about the *Coble* plaintiffs' demands for

more detailed information about the net worth of C&S.

(Revised Leghorn Aff. ¶ 6.)  Specifically, Mr. Leghorn

testified credibly that around December 2013, a new

accounting of C&S's net worth was disclosed to class

counsel that was significantly higher than the number

disclosed approximately two to three years earlier.  (Hr'g

Tr. 33:19-34:5; 36:19-36:24.)  Mr. Leghorn testified that

Mr. Pashkin participated in at least one conference call

during which he, Mr. Cohen, Mr. Slamowitz, and Mr. Leghorn

discussed the impact that this new net worth number would

have on the potential settlement amount.  (Hr'g Tr. at

34:2-34:8; 30:17-31:9.)  Mr. Leghorn testified that Mr.

Pashkin was involved in discussions with Mr. Leghorn and

the attorneys at C&S regarding the firm's net worth and the

impact on the prospective settlement amounts demanded by

plaintiffs.  (*Id.* at 37:3-37:11.)  Mr. Pashkin exchanged

emails with Mr. Leghorn directly, with copies to the C&S

partners, regarding the results of the firm's class size

analysis and the best way to protect against future

lawsuits.  (*Id*. at 37:18-38:2.)  Mr. Leghorn testified that the net worth values were confidential pursuant to a court order and that the attorneys' discussions of values were protected by attorney-client privilege.  (Hr'g Tr. at 33:19-33:22; 46:1-46:14.)

Mr. Pashkin, on the other hand, affirmed that he never participated in conversations involving the net worth of C&S, stating that Mr. Leghorn's contention that Mr. Pashkin participated in such conversations is contrary to the fact that he was frequently reprimanded by Mr. Cohen, Mr. Slamowitz, and Mr. Selip for exceeding his authority. (Pashkin Aff. ¶¶ 14-15.)  The court does not credit Mr. Pashkin's denial of participating in net worth discussions in light of Mr. Leghorn's detailed, credible testimony regarding Mr. Pashkin's involvement in discussions of C&S's net worth in the context of the *Coble* litigation.  Mr. Pashkin testified, morever, that he was never reprimanded for exceeding his authority with regard to his work on the *Coble* litigation.  (Hr'g Tr. at 65:23-66:2.)

### 4. Mediation

As part of the *Coble* litigation, the parties participated in lengthy mediation overseen by Judge Stephen Crane of JAMS (formerly an acronym for Judicial Arbitration and Mediation Services, Inc.).  (Revised Leghorn Aff. ¶

10.) Mr. Pashkin and defendants do not dispute that Mr.
Pashkin's name was listed on the distribution list
maintained by the mediator. (*Id.*; Hr'g Tr. at 50:17-
50:20.) Mr. Leghorn testified that he was the lead counsel
who appeared on behalf of C&S on the mediation calls, but
after Mr. Pashkin took over for Mr. John as the Managing
Attorney of C&S, Mr. Pashkin also appeared on the mediation
calls. (Hr'g Tr. at 39:1-39:13.) Mr. Pashkin, however,
denies being present during any mediation calls. (Hr'g Tr.
at 50:10-50:16.) Rather, Mr. Pashkin testified that his
only role and purpose for being on the JAMS distribution
list was to make Mr. Cohen aware of when the mediation
sessions were occurring and ensure that Mr. Cohen was
available. (Hr'g Tr. at 49:1-49:12.) Mr. Pashkin
testified that on two occasions, he asked to listen in on
the mediation sessions, but that each time Mr. Cohen denied
his request. (Hr'g Tr. at 49:20-50:2.) The court notes
Justice Crane's records reflect that Mr. Pashkin is listed
as an attorney participating in the mediation. (Revised
Leghorn Aff. ¶ 10.)

## C. The Instant Litigation

Each of the plaintiffs in the instant litigation
was sued in state court by different banks that were
represented by C&S in efforts to collect debts. (*See*

Compl.) Plaintiffs allege that C&S used Midlantic to serve process in the state court lawsuits and continued attempting to collect the debt after C&S became aware of Midlantic's illegal practices in October 2006. (*Id.*) Each of the plaintiff's debt collection lawsuits was subsequently transferred to other law firms that replaced C&S as counsel, and the new law firms continued to attempt to collect the debts. (*Id.* at ¶ 165.) Plaintiffs allege that C&S failed to notify the new law firms that the debts they were attempting to enforce were invalid due to improper service by Midlantic. (*Id.* at ¶¶ 113-18.)

Plaintiffs Ms. Atwood and Mr. Kayani received notice to participate as class members in *Coble*, but opted not to join as members of the class. (*Id.* at ¶¶ 77, 96.) Mr. Pashkin does not dispute that the instant case is the same case with respect to plaintiffs Ms. Atwood and Mr. Kayani and is substantially similar with regard to Mr. Liew. (Hr'g Tr. at 79:20-79:25.) Mr. Pashkin also does not dispute that the interests of the plaintiffs in the instant litigation are materially adverse to the interests of C&S, his former employer. (Hr'g Tr. at 80:1-80:4.) The parties agree that C&S does not consent to Mr. Pashkin's representation of plaintiffs in the instant action against the defendants.

## II. Discussion

### A. Legal Standard

"The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court." *Cressell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). The court's authority to disqualify an attorney derives from its "inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream,* 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979)). The court must "balance a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." *GSI Commerce Solutions, Inc. v. BabyCenter, LLC,* 618 F.3d 204, 209 (2d Cir. 2010) (citation omitted).

Motions to disqualify opposing counsel "are viewed with disfavor in this Circuit because they are often interposed for tactical reasons and result in unnecessary delay." *Gabayzadeh v. Taylor,* 639 F. Supp. 2d 298, 300-01 (E.D.N.Y. 2009) (internal quotation marks and citations omitted). Although the party seeking disqualification bears a "heavy burden" of demonstrating that disqualification is warranted, *see Evans v. Artek*, 715 F.2d 788, 794 (2d Cir. 1983), "any doubt is to be be resolved in favor of disqualification," *Hull*

*v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).  As the

Second Circuit has explained:

> [D]isqualification has been ordered only in
> essentially two kinds of cases: (1) where an
> attorney's conflict of interests . . . undermines
> the court's confidence in the vigor of the
> attorney's representation of his client, or more
> commonly (2) where the attorney is at least
> potentially in a position to use privileged
> information concerning the other side through
> prior representation.

*Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764–65

(2d Cir. 1990) (citation omitted).

   1. <u>Rule 1.9</u>

   The New York Rules of Professional Conduct Rule 1.9

("Rule 1.9") provides guidance in the present situation.[5]  Rule

1.9 provides:

> Duties to Former Clients
>
>    (a) A lawyer who has formerly represented a
> client in a matter shall not thereafter represent
> another person in the same or a substantially
> related matter in which that person's interests
> are materially adverse to the interests of the
> former client unless the former client gives
> informed consent, confirmed in writing.

---

[5] Defendants' written submissions primarily rely on Canon 4 of the New York
Code of Professional Responsibility.  (*See* Mem. of Law in Supp. of Defs.'
Mot. ("Defs.' Mem."), ECF No. 19-7, filed 12/8/14.)  On April 1, 2009, the
New York Rules of Professional Conduct took effect, replacing Canon 4 of the
New York Code of Professional Responsibility.  *See* 22 N.Y.  Comp. Codes R. &
Regs. § 1200.0; *see also United States v. Quest Diagnostics Inc.*, 734 F.3d
154 n.1, 157 (2d Cir. 2013) ("The current version of the New York Rules of
Professional Conduct took effect on April 1, 2009, and is reprinted with
amendments in N.Y. Jud. Law App.")  New York's new rules, however, are
substantively similar to the old rules, and "[t]herefore, much of the
precedent interpreting the old rules still remains applicable." *Pierce &
Weiss, LLP v. Subrogation Partners LLC,* 701 F. Supp. 2d 245, 251 (E.D.N.Y.
2010).

(b) Unless the former client gives informed consent, confirmed in writing, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client:

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 or paragraph (c) of this Rule that is material to the matter.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client, except as these Rules would permit or require with respect to a current client or when the information has become generally known; or

(2) reveal confidential information of the former client protected by Rule 1.6 except as these Rules would permit or require with respect to a current client.

22 N.Y. Comp. Codes R. & Regs. § 1200.0, *reprinted in* N.Y. Jud. Law. App. (McKinney 2013).

Violation of New York's conduct rules, however, does not necessarily require disqualification of the offending counsel. *See, e.g.*, *New York v. Monfort Trust*, No. CV 12-3755, 2014 WL 5018607, at *2-3 (E.D.N.Y. Oct. 7, 2014). The Second Circuit has made clear that "[a]lthough the American Bar Association ('ABA') and state disciplinary codes provide valuable guidance," "disqualification is warranted only if 'an attorney's conduct tends to taint the underlying trial.'" *GSI*

*Commerce Solutions, Inc. v. BabyCenter, LLC.,* 618 F.3d 204, 209
(2d Cir. 2010) (quoting *Nyquist,* 590 F.2d at 1246).

The court applies Rule 1.9(a), otherwise known as the
"side-switching rule," here. *See Quest*, 734 F.3d 154, 161.
Rule 1.9(a) requires the moving party to establish that (1) the
attorney at issue formerly represented a client in a matter;
(2) the attorney seeks to represent "another person in the same
or a substantially related matter"; and (3) the person's
interests are "materially adverse to the interests of the
former client." Mr. Pashkin has already conceded elements (2)
and (3) of Rule 1.9(a), that the *Coble* case and the instant
case are substantially related and the interests of Mr.
Pashkin's new clients, the plaintiffs in this action, are
materially adverse to the interests of defendants.
Consequently, the only remaining issue is element (1), whether
Mr. Pashkin formerly represented C&S in the *Coble* case.

i. Former Representation

The guiding principle for determining whether an
attorney formerly represented a client in a matter for the
purposes of disqualification is whether the attorney was "in a
position to learn" "the confidences of former clients." *Silver
Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751,
756-57 (2d Cir. 1975); *see Allegaert v. Perot*, 565 F.2d 246,
150 (2d Cir. 1977) ("[B]efore the substantial relationship is

even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client."); *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) ("[W]here it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject matter of his subsequent representation, it is the court's duty to order the attorney disqualified.")(emphasis in original); *Ullrich v. Hearst Corp.*, 809 F. Supp. 229, 234 (S.D.N.Y. 1992)(Leval, J.)(holding that whether to disqualify an in-house lawyer requires focusing on the nature of the prior representation and "the likelihood that, in the course of it, confidences were reposed in [the attorney]" by the corporation that could be used to adverse effect against that corporation).

The lawyer's degree of involvement and the type of his involvement in a given matter are also relevant to determining whether disqualification is required. The second comment to Rule 1.9 explains:

> When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in that transaction clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later

> representing another client in a factually
> distinct problem of that type, even though the
> subsequent representation involves a position
> adverse to the prior client.

22 N.Y. Comp. Codes R. & Regs. § 1200.0, *reprinted in* N.Y. Jud.

Law. App. (McKinney 2013).

The ABA Formal Opinion on "Representation Adverse to

Organization by Former In-House Lawyer" states that "[t]he mere

fact that a matter was being dealt with by the legal department

while the lawyer was a member of that department does not by

itself satisfy the personal representation requirement

necessary for Rule 1.9(a) to apply to the subsequent adverse

representation." ABA Formal Op. 99-415 (1999). "A distinction

may be made between a lawyer who has been heavily involved in a

matter and one who has been only peripherally involved and has

dealt only with issues and not with factual analysis." *Id*.

The ABA cautioned that the mere fact "that in-house counsel has

had supervisory or administrative responsibilities with respect

to a matter that has been handled by his legal department, as

frequently occurs when the lawyer is general counsel or legal

department head, does not necessarily require a finding that he

represented the organization as to that matter." *Id*. Rather,

"[d]irect involvement in the matter, or a style of supervision

that results in access to material information concerning a

matter, must be shown in order to establish that the formerly

employed lawyer represented the organization in a specific matter." *Id.*

Fundamentally, the rule against successive representation as codified in its current form in Rule 1.9 and previously as Canon 4 "concerns itself with the unfair advantage that a lawyer can take of his former client in using adversely to that client information communicated in confidence in the course of the representation." *Ullrich*, 809 F. Supp. at 236; *see also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) (finding the risk of trial taint is present when an attorney "might benefit a client in a lawsuit by using confidential information about an adverse party obtained through prior representation of that party").

B. **Application**

As an initial matter, the court finds that Mr. Leghorn and Mr. Pashkin were both truthful and reliable witnesses and that their testimonies were generally credible. The primary factual disputes between the two testimonies are (1) whether Mr. Pashkin participated in multiple or only one discussion with Mr. Leghorn, Mr. Cohen, and other members of C&S about the proposed settlement agreement; (2) whether Mr. Pashkin participated in multiple or only one discussion with Mr. Selip and Mr. Wilkinson about how to analyze and structure the sizes of the class and subclass pursuant to the draft

settlement agreement; (3) whether Mr. Pashkin participated in

any discussions about the net worth of C&S; and (4) whether Mr.

Pashkin ever participated in a mediation call with Judge Crane.

In the absence of additional documentary evidence to resolve

these factual disputes, the court nonetheless credits Mr.

Legorn's testimony based on his detailed recollections about

Mr. Pashkin's participation in the *Coble* litigation and the

confidential discussions regarding C&S's settlement strategy.

In any event, the undisputed facts presented by the parties

constitute sufficient evidence to support the disqualification

of Mr. Pashkin as plaintiffs' counsel.[6]

Given that Mr. Pashkin has conceded that the instant

litigation and *Coble* are substantially related and that the

interests of his current clients are materially adverse to

those of C&S, the only remaining issue for the court is whether

Mr. Pashkin formerly represented C&S in the *Coble* and related

FDCPA litigation. Here, the undisputed facts demonstrate Mr.

Pashkin formerly represented C&S in *Coble* and related FDCPA

---

[6] Mr. Pashkin contends that any information about C&S's net worth to which he may have had access is now no longer confidential because the information is publicly available on ECF in the case of *Hallmark v. Cohen & Slamowitz, LLP*, 11-cv-842 (W.D.N.Y.). (Opp. to Mot. to Disqualify ("Opp.") at 20-21, ECF No. 20, filed 12/22/14.) Mr. Pashkin also argues that any confidential net worth information he may have had access to at the time of his employment with C&S is now irrelevant, because C&S no longer exists as an entity. (Letter from Mr. Pashkin dated 2/13/15, ECF No. 25, filed 2/13/15.) Because the court finds Mr. Pashkin's involvement in the *Coble* settlement agreement and class lists are sufficient to support Mr. Pashkin's disqualification, the above arguments are not relevant to resolving the motion.

litigation in the context of the instant motion to disqualify counsel.

As previously discussed, whether an attorney formerly represented a client in a matter for the purposes of disqualification primarily turns on the attorney's likely access to confidential information. Mr. Pashkin, in his role as the Managing Attorney of C&S, was in a position to, and did learn confidential information that could be used by his current clients to the detriment of his former employer. Mr. Pashkin not only had access to, but he also actively reviewed and discussed with C&S attorneys and Mr. Leghorn, drafts of the *Coble* settlement agreement, which were highly confidential and also subject to attorney-client privilege. He also was privy to confidential and privileged conversations, whether in person, on the telephone or via email, between Mr. Cohen, a named defendant and partner of C&S, and Mr. Leghorn, the firm's outside counsel, about how the class size and net worth of C&S would affect their negotiation strategy, the future exposure of C&S and ultimately whether C&S should accept the terms of the settlement agreement. Mr. Pashkin also had access to confidential and privileged information about how the class and subclass lists were determined and structured pursuant to the settlement agreement in *Coble*. Mr. Pashkin's insistence that his tasks in the *Coble* matter were rather circumscribed is

misplaced, because the operative question is whether he likely had *access* to relevant confidential information. *See, e.g.,* *Gov't of India v. Cook Indus.*, 569 F.2d 737, 740 (2d Cir. 1978)("[I]n order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case."); *Evans*, 715 F.2d at 791 (holding that the relevant test is whether the attorney whose disqualification is sought "had access to, or was likely to have had access to, relevant privileged information").

In *Ullrich v. Hearst Corp.,* the lawyer who was the subject of a disqualification motion had represented the corporation both as staff attorney and outside counsel on numerous labor and employment issues for nearly twenty years. 809 F. Supp. 229, 230–31 (S.D.N.Y. 1992).  When his relationship with the corporation ended, he began to represent three former employees of the corporation on claims against the corporation.  *Id.* at 232.  The attorney in *Ullrich* maintained that he did not have confidential information of the corporation that was pertinent to the new cases and would not disclose any privileged material.  *Id.* at 233.  Nevertheless, Judge Leval concluded that the attorney was disqualified because he likely acquired general, confidential information

regarding the employment practices of the corporation. *Id*. at 234–35.

Here, although the duration of Mr. Pashkin's involvement with *Coble* and FDCPA litigation at C&S did not span twenty years, Mr. Pashkin acquired specific, confidential and privileged information about settlement strategy and the structuring of the class and subclass size in *Coble*, as well as C&S's internal policies after becoming aware of Midlantic's illegal actions.  Additionally, based on the representation in Mr. Pashkin's CV that he made "recommendations to Senior Management of law firm based on issues exposed by [FDCPA] lawsuits against firm, potential risks related to the practices of its clients, and operational deficiencies," Mr. Pashkin also obtained general, confidential information about C&S's debt collection practices.

As counsel representing two opt-out plaintiffs of the *Coble* class and a third plaintiff whose claims arise out of substantially similar facts, Mr. Pashkin's prior access to C&S's confidential information may be used to C&S's detriment in this litigation.  For instance, Mr. Pashkin's access to the draft settlement agreements and subsequent discussion of proposed modifications revealed particular negotiation strategies or goals for C&S in striking a deal that may aid Mr. Pashkin in settlement negotiations and in the instant

litigation.  *See, e.g.*, *Ullrich*, 809 F. Supp. at 236 ("Adverse use of confidential information . . . includes knowing what to ask for in discovery, which witnesses to depose, what questions to ask them, what lines of attack to abandon and what lines to explore, what settlements to accept and what offers to reject, and innumerable other uses.")  Indeed, Mr. Leghorn testified that Mr. Pashkin was involved in confidential discussions regarding the agreement to include a subclass in the *Coble* settlement to avoid a "next generation" of lawsuits given the "potential for a series of individual lawsuits." (Hr'g Tr. at 31:10-32:2.)  As managing attorney, Mr. Pashkin was involved in discussions with Messrs. Leghorn, Cohen and Selip regarding the impact of orders to show cause to vacate judgments obtained by C&S because Mr. Pashkin's role was to supervise the attorneys at C&S who would be responding to the show cause orders. (*Id.* 41:12-42:6.)  Thus, Mr. Pashkin was well aware that C&S feared precisely the type of lawsuit he now brings against C&S. Consequently, the court finds that the risk of trial taint is present here, where Mr. Pashkin might benefit the plaintiffs by using confidential information obtained through his employment at C&S.  *See Glueck*, 653 F.2d at 748.

Mr. Pashkin opposes the motion for his disqualification by arguing that he entered the *Coble* case "briefly on the periphery for a limited and specific purpose

relating solely to legal questions" as the attorney did in
*Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518
F.2d 751, 756 (2d Cir. 1975).  (Opp. at 27-28.)  Although the
Mr. Pashkin was not involved in the *Coble* litigation for the
entire duration, he was involved during critical strategic
settlment discussions.  Thus, the facts here are
distinguishable from *Silver Chrysler Plymouth*.  As an initial
matter, in *Silver Chrysler Plymouth*, the attorney in question
was a junior associate at Kelley Drye, which the Second Circuit
recognized was "one of New York's larger law firms, having had
at the time some 30 partners and 50 associates." *Id*. at 753.
As of July 2010, C&S had fourteen lawyers, (Andrew Martin,
*Automated Debt-Collection Lawsuits Engulf Courts*, N.Y. Times,
July 12, 2010, at B1), approximately seven of whom were
supervised by Mr. Pashkin when he became managing attorney in
spring 2013.  (Hr'g Tr. at 53:21-54:3.)  More importantly, Mr.
Pashkin's role in discussing and reviewing the draft settlement
agreement in *Coble* and subsequently managing the related
default judgment litigation in state court, including making
decisions as to whether to oppose or consent to motions to
vacate default judgments are more than "brief, informal
discussions on a procedural matter or research on a specific
point of law." *Silver Chrysler Plymouth,* 518 F.2d at 756.  If
anything, Mr. Pashkin's supervision of the firm's responses to

Orders to Show Cause and motions to vacate default judgments likely required him to become "involved in the facts" of each state court action, such as whether Midlantic attempted service, whether Midlantic falsified affidavits, and when C&S became involved in the debt collection. *Id*. These facts are material to the instant litigation, which requires investigation of substantially similar facts. The Second Circuit in *Silver Chrysler Plymouth* exempted discrete procedural or legal issues, because the guiding concern of the disqualification analysis is the protection of client confidences. As previously discussed, there is a significant risk that Mr. Pashkin will use confidential information to the disadvantage of C&S in the instant litigation.

Mr. Pashkin also contends that disqualification is not proper, because he did not share an attorney-client relationship with C&S. (Opp. at 13-14.) The six-factor test to which Mr. Pashkin cites for determining the existence of an attorney-client relationship does not apply here. As previously described in the legal standards section of this Memorandum and Order, the guidance regarding "former clients" is provided by Rule 1.9 and its comments, case law applying Rule 1.9 and Canon 4, and relevant ABA Formal Opinions.

## Conclusion

For the foregoing reasons, defendants' motion to disqualify Mr. Pashkin as counsel for plaintiffs is hereby granted. Plaintiffs are granted 30 days to obtain new counsel, who shall file a notice of appearance in this action.

**SO ORDERED.**

Dated:      September 22, 2015
            Brooklyn, New York

                        _____/s/_____
                         Kiyo A. Matsumoto
                         United States District Judge